# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| UNITED STATES OF AMERICA | \* |
| PLANTIFF. | \* |
|  | \* |
|  | \* |
| Vs. | \* |
|  | \* |
|  | \* |
| MARIO SIMBAQUEBA BONILLA | \* |
| MOVANT. | \* |
|  | \* |



CRIMINAL

N: 07-CR-20897-HUCK

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

\*  BONILLA'S REPLY IN SUPPORT OF MOTION TO DISMISS  \*

\*  INDICTMENT OR IN THE ALTERNATIVE MOTION FOR  \*

\*  DISCOVERY AND AN EVIDENTIARY HEARING  \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Until today, BONILLA has refrained from alleging INTENTIONAL MISCONDUCT by the Government, and that disqualification of certain Government's attorneys should be considered by the Court, BONILLA can no longer do so in good conscience. When BONILLA review the answer given by AUSA MARC OSBORNE ("OSBORNE") on

behalf of the Government (DE-94), BONILLA filed with the eleventh Circuit a motion abate or expedite the mandate of the direct appeal, due to the astonishing concessions by United States attorney (criminal division) VIJAY SHANKER, ESQ ("SHANKER") in regard to BONILLA'S allegations. He declared to OSBORNE (so he says):

> "SHANKER confirmed that he is an attorney for the appellate section, criminal division, Department Of Justice. HE FURTHER CONFIRMED THAT UNAUTHORIZED WITHDRAWALS WERE MADE FROM HIS FATHER'S AND HIS E-TRADE ACCOUNTS IN APPROXIMATELY MID-2007".

**Govr** at 5 (DE-94) (footnote 5). That is exactly one of the facts BONILLA was asking discovery, now it is conceded that SHANKER and his father were victims. Then he concluded:

> "However, he had no idea who withdrew the funds until the undersigned contacted him about SIMBAQUEBA-BONILLA'S motion".

**Govr** at 4. This is a difficult sale to make as we shall see in the pages to follow. In this case, though the Court labored to try to provide a fair proceeding the Court necessarily had to rely on the integrity of the Government, and it is now clear that the Government's prosecution of BONILLA lacked integrity.

- 3 -

The Government still doesn't get it, this is an extremely serious matter. This case must be dismissed. No other remedy will deter future prosecution teams from engaging in the same tactics. No other remedy will prevent what has happened in this case from happening again. BONILLA is aware of this Court's order taking the motion to dismiss under advisement (DE-95) but respectfully submits this pleading so it becomes part of the record. As there are other motions like "motion for a proposed discovery plan" and some other evidence BONILLA will file those documents after the eleventh Court of appeals either issue mandate/abate the direct appeal. The focal point of this pleading is to put into perspective, and trace the anatomy of the Government's response, we will divide the answer in 7 subsections.

I. **BONILLA AGREES WITH THE GOVERNMENT THAT ALL DOCUMENTS AND FILINGS SHOULD BE MADE PUBLIC**

In its response the Government states:

> "SIMBAQUEBA BONILLA has moved to seal his motion to dismiss. As the Government sees no reason to seal the motion to dismiss, we oppose the motion to seal".

**Govr** at 1 (footnote 1). But in a way that is not up to the Government or BONILLA:

- 4 -

> The decision whether to seal a judicial
> record is, at least with respect to the
> common law right of access, committed to the
> discretion of the District Court.

Nixon Vs. Warner Communications, 435 U.S. 589, 599 (1978).

Either the Government is trying to use "reverse psychology", with the Court or it really does not care about the reputation of persons and entities that are going to be named throughout this litigation. As WILLIAM SHAKSPEARE put it centuries ago:

> "[T]he purest treasure mortal times afford is
> spotless reputation; that away, men are but
> gilded loam, or painted clay".

William Shakspeare, Richard II, act 1, scene 1, lines 177-178 (1597) (cited by Honorable ADALBERTO JORDAN in United States Vs. Steinger, 626 F. Supp. 1231, 1235 (S.D. FLA, 2009)). BONILLA still believes, this is a sensitive subject with personal and professional implications for multiple civil servants who are entitled to due process and their administrative rights.

One final point comes to mind, the very same information the Government in its response it is trying to make public, is the same information that the office of professional responsibility ("OPR",) and the Executive Office of the United States attorney ("EOUSA"), of the D.O.J., is refusing to disclose to BONILLA under F.O.I.A.:

> "I have decided to refuse to confirm or deny
> the existence of records to your request
> ...".

OPR (Exhibit A). Under this **Glomar** response, ("named after United States vessel "HUGHES GLOMAR explorer" which was subject of a F.O.I.A. request"). And F.O.I.A. exemptions **5 U.S.C. §§552(b)(6) and (b)(7)(c)** that deal with "unwarranted invasion of personal privacy", to say more will be to paint the lilly.

To sum up, BONILLA interprets the Government's answer to to this issue, that they are comfortable with this litigation be disclosed to the public and the media with no restrictions, now BONILLA moves on to the second issue.

## II. DUE TO THE CIRCUMSTANCES OF BONILLA'S CASE IS IT PROPER TO DISQUALIFY THE DEPARTMENT OF JUSTICE FROM REPRESENTING THE GOVERNMENT ?

The disqualification of Government counsel is "a drastic measure and a Court should hesitate to impose it except where necessary" **United States Vs. Bolden**, 353 F.3d 870, 878 (10th Cir. 2003) while a private attorneys conflict of interest may require disqualification of that attorney's law firm in certain cases,

such approach its not favored when it comes to the office of the United States attorney. See **United States Vs. Badalamenti**, 794 F.2d 821, 828 (2nd Cir. 1986) moreover, the Justice Department's institutional characteristics lessen the need for wide range office disqualification. See **United States Vs. Caggrano**, 660 F.2d 184, 190-91 (6th Cir. 1981) while simultaneously causing such disqualification to implicate concerns over the administration of justice, and separation of powers. See **United States Vs. Bolden**, 353 F.3d 870, 879 (10th Cir. 2003).

Just as this considerations weigh against the disqualification of individual United States attorney's offices, they weigh even more heavily against disqualification of the entire Department Of Justice.

Accordingly, Courts have allowed disqualification of Government counsel only in limited circumstances. See **Young Vs. United States Ex. Rel. Vuitton Et Fils S.A.**, 481 U.S. 787, 807, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) (amply discussed in BONILLA'S motion to dismiss) ("actual conflict of interest because appointed prosecutor also represented another party"). **United States Vs. Heldt**, 668 F.2d 1238, 1275 (D.C. Cir. 1981) (bona fide allegations of bad faith performance of official duties by Government counsel in a civil case") while a prosecutor

- 7 -

is not expected to be as guardedly neutral as judge, the broad discretion afforded implies a corresponding duty. See **Marshal Vs. Jerrico**, 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) ("observing that the requirement of neutrality is jealously guarded by this Court").

Between the private life of the citizen and the public glare of a criminal accusation:

> **Stands the prosecutor. That state official has the power to employ the full machinery of the state in scrutinizing any given individual. Even if a defendant is ultimately acquitted, force inmertion in criminal investigation and adjudication is a wrenching disruption of every day life. For this reason, we must have assurance that those who would wield this power will be guided solely by their sense of public responsibility for the attainment of justice.**

**Young**, 481 U.S. at 814, 107 S.Ct. 2124.

Despite that the Government has its own rules for recusal. See **28 U.S.C. §528** and Government attorneys should strictly comply with these procedures (see United States attorney manual ("USAM") **§ 1-3.515**). The attorneys in this case do not recognize that there is a conflict of interest so they will not comply with these procedures if they do not acknowledge there is a problem.

- 8 -

The question whether BONILLA'S rights were violated (or are presently being violated) is not left for his adversary to determine, but for a Court of law. With that in mind, we turn to the specifics of the instant case. BONILLA believes that AUSA MARC OSBORNE as he states: "Not involved in the original prosecution" has to establish "Chinese walls" between the computer crime attorney WILLIAM YUREK, ESQ -who should not be allowed to participate in any further proceeding of this case- so he does not get pollute with the conflict of interest issue.

Needless to say that appellate attorney VIJAY SHANKER should not participate in any proceeding of the instant matter (he says he was not even aware of it), fortunately for all involved RICHARD BOSCOVICH, ESQ is not in the Department Of Justice anymore.

BONILLA has no confidence in the neutrality of the persons involved so far in his prosecution, and is troubled because of the unique nature of the United States attorney's representation due to the fact that there is a potential greater problem in its continued prosecution of BONILLA. Unquestionably all that will be coming as a result of this litigation is potentially prejudicial both to the reputation of their office and that of the Government. In this regard, the interest of the United States

- 9 -

attorney's office and that of the sovereign Government may not be aligned because revelation of wrongdoing, which may be required in the service of truth and justice to BONILLA cannot help but cause reputational injury to the United States attorney's office. And here the relevant inquiry for the Court, "is not the reality of BIAS or prejudice, but its appearance" **Likety Vs. United States**, 510 U.S. 540, 548, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

The standard is whether an objective, fully informed lay observer would entertain significant doubt of the prosecutor neutrality. **Thomas Vs. Tenneco Packing Co, Inc.**, 293 F.3d 1306, 1329 (11th Cir. 2002) (about judge but applicable) in other words the relevant inquiry is "how things appear to the well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical and suspicious person" **United States Vs. Jordan**, 49 F.3d 152, 156 (5th Cir. 1995).

Indeed "[a] very strict standard of proof must be applied to the rebuttal of this presumption [conflict of interest]... and any doubts as to the existence of an asserted conflict must be resolved in favor of disqualification" **La Salle Nat Bank Vs. County of Lake**, 703 F.2d 252, 257 (7th Cir. 1983). In deciding questions of disqualification the Court shall balance the

- 10 -

respective interest of the defendant, the Government and the public. See **United States Vs. O'malley**, 786 F.2d 786, 790 (7th Cir. 1986). The public has an interest in assuring that Government is not corrupt and the public officials, officers of the Court, perform their duties in a correct way.

However and before reaching the conclusion of this section, recent cases of Government misconduct should raise red flags to the Court when deciding this issue of disqualification let's take for example the case against senator TED STEVENS (Alaska) **United States Vs. Stevens**, CR No. 08-231 (EGS) (D.C. April 1, 2009) in this case attorney general ERIC HOLDER moved to set aside the conviction of senator STEVENS and dismiss the case with prejudice. As the presiding judge in this case Honorable EMMET G. SULLIVAN , subsequently wrote the advisory committee in urging it to propose again and amendment of **Rule 16** to require the disclosure of all exculpatory information (Exhibit B) -complete text of the letter of Judge SULLIVAN-. The attorney general's motion was granted and the case against senator STEVENS --who lost his bid to be re-elected after his wrongful conviction-- was dismissed, all because a team of the elite lawyers of the public integrity section (BRENDA MORRIS, (et. al)) decided to mislead the Court up to the last minute.

- 11 -

Also in this District in **April 2009** Honorable ALAN S. GOLD
sanctioned the Government and the prosecutors individually
(ANDREA HOFFMAN et. al) for a wide array of misconduct, including
violations of their duty to disclose exculpatory evidence. See
**United States Vs. Shaygan**, No. 08-20112-CR, 2009 WL 980289 (S.D.
Fla April 9, 2009) (order on motion for sanctions under hyde
amendment at 9, 19, 23-24, 32-38). The sanctions included an
order that the Government pay approximately $600.000 of the
defendant's legal fees under the hyde amendment, **18 U.S.C.
§3006A**.

BONILLA asks this Court to disqualify the following United
States attorney's from further participating in any proceeding
due to a conflict of interest:

> **WILLIAM YUREK, ESQ**
>
> Computer Crime and Intellectual Properly Section.
>
> Department Of Justice.
>
> Washington D.C.

> **VIJAY SHANKER, ESQ**
>
> Appellate Section.
>
> Department Of Justice.
>
> Washington D.C.

- 12 -

Because this attorneys will cause an "appearance of impropriety" until the issues raised in the present litigation are decided by this Court.


## III. SPECIFIC FACTUAL ALLEGATIONS TO PROVE CONFLICT OF INTEREST

The Government in its response states:

> "[H]e [BONILLA] makes no proffer as to how he would prove any of this factual allegations ...".

Govr at 4-5. Let the Government make no mistake, this is not a "FISHING EXPEDITION" and with the limitations that a pro-se litigant has BONILLA will show the Court that the framework in which this specific United States attorney prosecuted BONILLA'S case is improper, better yet is against the law.

This case arises at the intersection of need of factual discovery and the need for an evidentiary hearing, in a post-sentence motion to dismiss indictment; BONILLA imports the concept of evidence that need to be proffered in a vindictive prosecution claim and applies it to the instant case based on two Supreme Court's cases: **United States Vs. Goodwin**, 457 U.S. 368,

- 13 -

102 S.Ct. 2485, 73 L.Ed.2d 74 (1982); and **Blackledge Vs. Perry**, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974).

        To establish conflict of interest, a defendant must show trough objective evidence (1) that the prosecutor acted with genuine animus toward the defendant and (2) that the defendant would not have been prosecuted but for that animus. See **Goodwin**, 457 U.S. at 380 n.12. If defendant is unable to prove improper motive with direct evidence he may still present evidence of circumstances from which an improper motive may be presumed. To invoke such a presumption, a defendant must show that the circumstances "pose a realistic likelihood of 'vindictiveness'" **Blackledge**, 417 U.S. at 27, By recognizing the possibility of creating a presumption that shifts the burden to the government to justify its conduct, not only improper motives are deterred, but also defendants are "freed of [the] apprehension of such a retaliatory motivation" **Goodwin**, 457 U.S. at 376. But such a presumption is warranted only when circumstances warrant it for all cases of the type presented. **Id**. 457 U.S. at 381.

- 14 -

To sum up:

```
* * * * * * * * * * * * * * * * * * * * * * * *
*  WHEN A PRESUMPTION OF AN IMPROPER MOTIVE IS  *
*  WARRANTED,   THE   BURDEN   SHIFTS   TO   THE  *
*  GOVERNMENT  TO  PRESENT  OBJECTIVE  EVIDENCE,  *
*                 JUSTIFYING ITS CONDUCT          *
* * * * * * * * * * * * * * * * * * * * * * * *
```

**Goodwin**, at 374-76 n.8, 102 S.Ct. 2485. Let us turn to the specific factual allegations.

The facts that BONILLA is trying to prove:

(1). That VIJAY SAHNKER, ESQ is a United States attorney of the Criminal Division in Washington D.C..

(2). That SHANKER and his father had financial accounts in E*TRADE bank (federal insured bank).

(3). That SHANKER and his father were victims of fraud on or about **May/2007.**

- 15 -

(4). That SHANKER knew the perpetrator was BONILLA.

(5). That SHANKER was involved in BONILLA'S prosecution (directly or collaterally).

(6). That WILLIAM YUREK knew at all times that SHANKER had been a victim.

(7). That S.A. JIM OLMSTEAD knew all along that SHANKER was a victim.

(8). That RICHARD DOMINGUEZ BOSCOVICH, ESQ exercised his prosecutorial discretion from charging to sentencing under a motivation for a job at Micrsoft Corporation and knowing that there was a United States attorney had been a victim of the felony.

Let us take each factual allegation in turn (1) (2) (3) has been conceded by SHANKER himself in the response, so we start the analysis knowing that there was a victim from the D.O.J. Criminal Division in Washington D.C.

- 16 -

### (4). THAT SHANKER KNEW THE PERPETRATOR WAS BONILLA

> "He [SHANKER] furthered confirmed that unauthorized withdrawals were made from his father's and his E*TRADE accounts in approximately mid-2007. However, he had no idea who withdrew the funds until the undersigned contacted him about ...".

Govr at 5. That SHANKER "had no idea who withdrew the funds" is a contention that in the face of the circumstances is "wholly incredible".

> "[N]othing is more damaging to a new truth that an old error".

Goethe, Spruche, In Prossa. First of all when a person is faced with intrusion in an online account (like the ones in E*TRADE) the name of the person, on the receiving account (where the wire goes) appears everywhere, in this particular case BONILLA'S name appeared everywhere in SHANKER'S online accounts (Exhibit C) (example of wire request at E*TRADE). So it is almost impossible that he hadn't seen BONILLA'S name when he first logged in the accounts, after the unauthorized withdrawal was made.

Second, one of the withdrawals was done with a fax to E*TRADE that bears BONILLA'S name and signature. Third in order,

for a bank to return the money to the costumer (in this case SHANKER and his father), affidavits (which should be in possession of E*TRADE bank) has to be signed stating that the beneficiary of the wires (withdrawals) is unknown to the costumer, and that the costumer did not authorize such withdrawals (Exhibit E) (example of an affidavit). Moreover the bank had to show him a copy of the fax that ordered one of the withdrawals so SHANKER would reject he had knowledge of it.

There is another loose end to his contention, when BONILLA pled guilty on **January, 2008** and when this prosecutors (BOSCOVICH, SHANKER, YUREK) wanted to show the world what they had done, there was a press release from D.O.J. Washington signed by ALICE S. FISHER assistant attorney general (an SHANKER'S boss) that unleashed headlines all over the world. (Exhibit-D).

It was front page in the New York Times, Washington Post, The Miami Herald, Los Angeles Times, USA Today, Chicago Tribune among others.

```
* * * * * * * * * * * * * * * * * * * * * * * *
*  AND NOW, MR. SHANKER COMES AND SAYS THAT HE  *
*  "DID NOT KNOW IT WAS BONILLA" HOW CAN HE SAY  *
*                   THAT ...?                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

- 18 -

(5). **THAT SHANKER WAS INVOLVED IN BONILLA'S PROSECUTION**

This is perhaps a difficult one to prove with "direct evidence", but the causation requirement can be shown with two expressions that prosecutors like to use a lot to wit: "reasonable inference", "logical inference".

A. **TEMPORAL PROXIMITY**

SHANKER asserts that the fraud was somewhere in the mid-2007. BONILLA asserts that the fraud took place in **May 2007.** Let's rehearse the facts that are relevant to this issue, since the only federal agency involved in the investigation was Defense Criminal Investigation Service ("DCIS"), it necessarily follows that the whole investigation should have started when the intrusion in the Department of Defense payroll began. The incidents in "my pay" (payroll) were spread between **December 2006** and **February 2007,** the actual real loss of this incident comes to approximately **$7000.00 dollars** but surprisingly the first grand jury subpoena was in **June 2007.** The temporal proximity element of the causation closely relates to SHANKER'S incident **(May 2007)** as to the timing of the grand jury subpoena. So the "reasonable inference" is that SHANKER'S incident was the cause for the investigation.

- 19 -

BONILLA does not know what the threshold amounts to launch an investigation of this caliber is, but it is hard to understand how **"The Pentagon"**, launches such an investigation for **$7000.00 dollars**. Once again BONILLA is not minimizing his crime, which he accepted and pled guilty to, but is trying with the evidence that he has available to show this Honorable Court that there were some improper factors triggering everything.

## B.   E*TRADE BANK

This is the bank where SHANKER and his father have the accounts. E*TRADE BANK is a federal insured institution (FDIC), and one of the biggest online firms in the United States. This bank sustained 50%± of the losses in this fraud. This Bank was aware of BONILLA'S aliases and had identified all the incidents involving BONILLA (see table of incidents Exhibit F). The time when E*TRADE was contacted is unknown to BONILLA, if they were ever issued a grand jury subpoena is also unknown but after being the victim who sustained most of losses and after they reported victims with $4.400 (intended loss). See a sample of the specificity that they reported each incident (Exhibit G).

- 20 -

One wonders:

```
* * * * * * * * * * * * * * * * * * * * * * * *
*  WHY DID NOT E*TRADE BANK REPORT THE FRAUD OF  *
*  MR. SHANKER AND HIS FATHER TO THE AGENT  *
*                  (OLMSTEAD) ?                  *
* * * * * * * * * * * * * * * * * * * * * * * *
```

Did they do a "selective disclosure" of the victims ?. Did Somebody tell them not to report the SHANKERS ?. Did they report the fraud, but this was never shown to the Court or BONILLA ?. Maybe, MR. ERIK GAMLEM, E*TRADE corporate investigator has something he wants to share regarding the instant issues. As the Court can sense there are more questions than answers.

BONILLA does not believe that a corporation like E*TRADE bank is going to risk its reputation covering something like this. Regardless of all of this, where are the affidavits of fraud from MR. SHANKER and his father ?. Did E*TRADE returned the money to the SHANKERS ?. What is the status of that investigation?.

- 21 -

### (6) THAT YUREK KNEW AT ALL TIMES THAT SHANKER WAS A VICTIM

This can be shown with the contents of any document (including but no limited to books, papers. letters, correspondence, reports, memoranda, studies, calendars appointment books, diaries, notes, messages, computer facilitated or transmitted materials, images, photographs, polaroids, information on any computer database, audio and video tapes, recording transcripts, ledgers, printouts, contracts, checks, receipts and all copies or portion thereof) related to BONILLA and included between any communication between SHANKER AND YUREK.

There is something important, in the last debriefing when the "relationship" between the Government and BONILLA collapsed, both BOSCOVICH and YUREK asked BONILLA to remember any other victim in E*TRADE that would come to BONILLA'S mind, when they were sure that BONILLA did not remember anybody in particular with E*TRADE incidents they stood up from the negotiations table.

### (7). THAT S.A. JIM OLMSTEAD KNEW ALL ALONG THAT SHANKER WAS A VICTIM

If E*TRADE certifies that SHANKER and his father were victims then OLMSTEAD knew at all times.

- 22 -

(8). THAT RICHARD DOMINGUEZ BOSCOVICH ESQ EXERCISED HIS
PROSECUTORIAL DISCRETION FROM CHARGING TO SENTENCING
UNDER MOTIVATION (REWARD) FOR A JOB AT MICROSOFT CORP.
AND KNOWING THERE WAS A UNITED STATES ATTORNEY THAT HAD
BEEN A VICTIM

Before entering this issue BONILLA wants to paraphrase the
scottish poet:

> "The best laid schemes of mice and
> prosecutors often go awry".

Robert Burns: To a mouse (1785).

The crux of this inquiry lies in Microsoft Corp. when did
BOSCOVICH apply for a job ?. Who recommended, or endorsed him for
that job ?.

Microsoft is a corporation, and BONILLA is sure that it does
not want to be involved in such scandal by covering up a crime.
But judicial compulsion is needed here to get that evidence. Also
the communications between YUREK and BOSCOVICH (especially Email)
will shine a big light on how this prosecution was started.
BOSCOVICH said to one of the attorney's the following:

- 23 -

"If MARIO had not touch a big guy in D.C.,
this case would be different ...".


BOSCOVICH knows, he exercised his discretion for the wrong

motives BOSCOVICH knows he shifted courses, because at one point

he understood this was a simple fraud, but Washington did not

want him to proceed as a simple fraud, at one point BONILLA saw

the first draft of the indictment that BOSCOVICH did, it was

nothing like the final one, the first one contained wire fraud,

and mail fraud and a general conspiracy, and the day of the

arraignment BONILLA saw something different 5 counts of

aggravated identity theft (18 U.S.C. §1028A) 4 counts of identity

theft (18 U.S.C. §1028(a)(7)) 5 counts of credit card fraud (18

U.S.C. §1029) what happened  to the first 3 count indictment

draft ?.


Washington knew the real loss of the fraud was less than

$360.000 and with that loss, a first time offender they could not

get the years they wanted. Your Honor said it at sentencing:


"The Court: Just so the defendant knows and all of the
people who have an interest in this
situation the original sentence was 255-
months ...".


TR. Sent. at 77 (lines 6-8).

- 24 -

To get to 20 years and fifteen months they needed something were the prosecutorial discretion would play a big role and they found the right variables:

* INTENDED LOSS

* §1028A CONSECUTIVENESS

Unfortunately BOSCOVICH discretion had been polluted. He was not aligned with the interest of justice anymore.

IV. <u>BONILLA'S PERSONAL KNOWLEDGE ABOUT DEFRAUDING SHANKER AND SHANKER'S FATHER</u>

The Government states:

> "Whether he [BONILLA] defrauded SKANKER and SHANKER'S father is presumably a matter within SIMBAQUEBA BONILLA personal knowledge ...".

<u>Govr</u> at 5. This contention is not true. It took BONILLA two and a half years to figure out why the Government had acted the way it did. It was when MR. SHANKER acted as a prosecutor in a case that

- 25 -

went public and that Supreme Court case arrived to BONILLA'S hands (**Robin L. Peoples Vs. United States**) that BONILLA came to realize that SHANKER'S name was related to some transactions.

There was no way of knowing back then who MR. SHANKER was. So it is not "personal knowledge" as the Government puts it, it is "acquired knowledge", through hard work, investigation, study, firm belief in justice, and the help of people who always believed there was something wrong in this case. BONILLA acknowledge the great support he has received from GEORGETOWN UNIVERSITY (G.U. law center and continuing legal education), without them the legal research would have been almost impossible. As the Supreme Court stated in **Krulewitch Vs. United States**, 336 U.S. 440, 445 (1949):

> "The tendency of a principle to expand itself
> to the limit of its logic".

## V. DISCOVERY AND EVIDENTIARY HEARING THRESHOLD

The Government states:

> "Because  SIMBAQUEBA-BONILLA'S   motion   is
> based entirely on speculation, it should be
> denied  without  an  evidentiary  hearing  or
> additional discovery ...".

- 26 -

**Govr** at 6. **Speculation**: "The act or practice of theorizing about matters which there is no certain knowledge". (**Black's Law Dictionary** (8th Edition. 2004)). The critical statement both for factual discovery and an evidentiary hearing is:

> **A petitioner is entitled to an evidentiary hearing [or discovery] if he alleges facts which, if true, would entitled him to relief.**

See **Tejada Vs. Dugger**, 941 F.2d 1551, 1559 (11th Cir. 1991); **Stano Vs. Dugger**, 901 F.2d 898, 899 (11th Cir. 1990) (en-banc) (same). Before getting into the specifics of discovery or evidentiary hearing, first BONILLA will identify the facts that if proven true will entitle him to relief:

MR. SHANKER a United States attorney was the victim of BONILLA'S felony, he caused prosecutors from Washington and the Southern District Of Florida to engage in a prosecution to vindicate his own personal interests. MR. BOSCOVICH the prosecutor from the Southern District Of Florida was permeated and rewarded for his conviction and sentence, he received and endorsement / recommendation for a job in Microsoft Corporation. His [BOSCOVICH] prosecutorial discretion was tainted throughout all of BONILLA case.

- 27 -

Assuming, ARGUENDO, that all of the above facts are true each and everyone of the proceedings in BONILLA'S case is voided AB-INITIO. As justice CLARK expressed it in the seminal case of the "Exclusionary Doctrine":

> "[T]he criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a Government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence [...] 'Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. * * * If the government becomes a law breaker, it breeds contempt for the law; it invites every man to become a law unto himself; it invites anarchy'".

Mapps Vs. Ohio, 367 U.S. 643, 659, 81 S.Ct 1684, 6 L.Ed.2d 1081 (1961) (internal citations omitted).

Those facts are not empirical propositions, or conclusory allegations, and they are as specific as they can be, now it is time to prove them, for that BONILLA is asking for the help of the Court in the following way:

- 28 -

## A. DISCOVERY

The facts of this case are, happily, not stuff of typical "Government misconduct" disputes. A prosecutor who accepts a thing of value is "biased" in the most basic sense of the word. In any event, difficulties of proof aside, there is no question that, if could be proven those facts would amount to a violation of the due process clause, the bill of rights, and the common notions of justice.

> **"Where specific allegations before the Court show reason to believe that the petitioner may, if the facts are fully develop, be able to demonstrate that he is [...] entitled to relief, it is the duty of the Court to provide the necessary facilities and procedures for adequate inquiry".**

**Harris Vs. Nelson**, 394 U.S. 286, 300, 89 S.Ct. 1082, 1091, 22 L.Ed.2d 281 (1969). This Circuit, has expressed its opinion regarding discovery when there is a breach of the public trust. In **United States Vs. Espinosa-Hernandez**, 918 F.2d 911 (11th Cir. 1990) (per curiam). The Court said: The District Court abused its discretion in denying ESPINOSA'S motion for discovery into special agent "URSO" alleged misconduct **Id.** at 913. "URSO" stands accused of serious and disturbing breaches of the public trust [...] If this conduct is proven the so discovered evidence would be beyond that of mere impeachment and a new trial would be

- 29 -

necessary to "remove the taint" from ESPINOSA'S conviction **Id.** at 914. Discovery might also enlighten the District Court as to when the United States attorney's office first learned of the disturbing allegations against "URSO" [...] The requested discovery might lead to evidence showing bad faith in URSO'S misstatements to the grand jury and his criminal complaint affidavit **Id.**

BONILLA asserts that he has made a sufficient factual showing to establish "good cause", for this Court to grant discovery on his claims, although the scope and extent of such discovery is in the sole discretion of this Honorable Court.

B. **EVIDENTIARY HEARING**

In the case at bar, supplement fact-finding is necessary because the facts needed are not within the record itself, BONILLA asserts that the facts as they stand right now make out a prima facie case of improper motive in the institution of the prosecution. For a Court to grant an evidentiary hearing there has to at least two conditions: (1) That there are issues of fact under dispute; (2) That those issues if proven true would warrant relief for defendant. See **Dugger**, 941 F.2d at 1559.

- 30 -

The disputed facts can be clearly seen in the Government answer:

1. **S.A. JIM OLMSTEAD (DCIS)**

    - Did not know that SHANKER or his father were victims [DISPUTED].

    - Stated SHANKER played no role in the prosecution of this case [DISPUTED].

2. **RICHARD BOSCOVICH (FORMER AUSA)**

    - Did not know that SHANKER or his father were victims [DISPUTED].

    - Stated SHANKER played no role in the prosecution of this case [DISPUTED].

    - Stated neither SHANKER nor anyone at the computer crime and intellectual property section helped him get his current job [DISPUTED].

- 31 -

3. **WILLIAM YUREK (COMPUTER CRIME D.O.J.)**

   - Did not know that SHANKER or his father were victims [DISPUTED].

   - SHANKER played no role in the prosecution of this case [DISPUTED].

   - That he did not helped BOSCOVICH get his current job [DISPUTED].


4. **VIJAY SHANKER (APPELLATE SECTION D.O.J)**

   - That SHANKER is an attorney in the criminal division in Washington D.C. [AGREED].

   - That SHANKER and his father possessed financial accounts at E*TRADE [AGREED].

   - That those accounts at E*TRADE had unauthorized withdrawals in mid-2007 making SHANKER and his father victims of whoever did those withdrawals [AGREED].

- 32 -

- That he had no idea who withdrew the funds [DISPUTED].

- Played no role in and knew nothing about BONILLA'S case [DISPUTED].

- Did not assist BOSCOVICH to get his current job [UNKNOWN].

**Govr** at 5. (footnote 5). As seen on the paragraphs above, just the fact that a United States attorney is a victim, which is conceded at this point, would warrant additional fact finding, BONILLA asserts at this point that at the very least he is entitled to additional discovery and then an evidentiary hearing, even if they are given on a limited basis.

## VI. PRO-SE REPRESENTATION

BONILLA knows and understands, that pro-se litigation has its limits, and that it would be a lack of respect, trying to engage in the role of a trained counsel in the Courtroom, without training from law school, notwithstanding that there is no "absolute right" to do so. That is the reason why BONILLA is

- 33 -

trying to retain new counsel in case this Court grants discovery and evidentiary hearing, (and with the help of his family that is securing a loan from a bank for that purpose). Finding an attorney for this conflict of interest issue, has turned out to be a nightmare, nobody wants to litigate against the "worlds largest law firm". As former chief justice BURGER aptly characterized the Department Of Justice. **United States Vs. Seil Engineering, Inc.**, 463 U.S. 418, 471 (1983).

## VII. CONCLUSION

In a case awash with extraordinary revelations, SHANKER'S concession that he personally sustained a fraud in his E*TRADE accounts in mid-2007, is perhaps the most shocking an important one. A federal prosecution has been irreversible damaged, but it is not too late to impose a sanction, that will send the message to other United States attorneys that this conduct will not be tolerated, anything less would be endorsing the Government's actions. The conclusion is unmistakable the Court should use its supervisory power to dismiss the indictment. Enough is enough, there must be and end to this behavior:

- 34 -

**FIRST** United states attorneys WILLIAM YUREK and VIJAY SHANKER should be barred from any further participation in BONILLA'S case due to a criminal conflict of interest, and because if this Court allows them to participate any longer will show an "APPEARANCE OF IMPROPRIETY", because when ethic is at stake "APPEARANCE AND REALITY CONVERGE AS ONE".

**SECOND** At the very least this Court has been presented with a "PRESUMPTION OF AN IMPROPER MOTIVE", and it necessarily follows that the burden of proof has shifted to the Government to justify its conduct.

**THIRD** If the Court is not prepared to dismiss the indictment outright at this time, it should first grant discovery and then grant and evidentiary hearing, to determine if it is necessary to use its "SUPERVISORY POWERS".

**FOURTH** It is axiomatic that the Government must turn square corners when it undertakes a federal prosecution. BONILLA invites the prosecutors, that if there is no taint in the proceedings, to submit sworn statements about the facts presented herein, that are being disputed. And of course, there is no need to worry about the Court granting discovery or an evidentiary hearing, if (as they say,) their decisions and acts rest squarely in justice,

- 35 -

and their prosecutorial discretion and conduct was not motivated by some sort of prosecutorial animus, such as personal stake in the outcome of the case or and attempt to seek self vindication.

**FIFTH** What are the mathematical odds that a victim of fraud that is being prosecuted by the criminal division D.O.J. (computer-crime section Washington), all of sudden it is discovered that there was a victim, that is an attorney of the criminal division D.O.J. (appellate section Washington) that was never disclosed in the proceedings ?. The mathematical odds of this situation to happen is zero (0). This is by no means a "FISHING EXPEDITION" and the Court has been shown "GOOD CAUSE" to give BONILLA the benefit of the doubt.

**SIXTH** Sadly and ironically, after all the publicity surrounding BONILLA'S case, including but not limited to, an official D.O.J. press release from Washington signed by assistant attorney general ALICE FISHER (see http://www.usdoj.gov/opal/pr/2008), which has been in numerous cases with MR. SHANKER (see e.g.: http: // www. usdoj. gov / osg / briefs / 2005 / Oresponses / 2005-0042. resp.html), as his direct boss. Despite all of this everybody seems to have "FRAGILE" memory because nobody remembers what happened.

- 36 -

SHANKER, YUREK, BOSCOVICH, S.A OLMSTEAD by their actions:

> "[H]ave poisoned the water in this reservoir, and the reservoir cannot be cleansed without first draining all the impurity. This is a federal criminal case, and this Court has supervisory jurisdiction over the proceedings [...] If it has any duty to perform in this regard, it is to see that the waters of justice are not polluted. Pollution having taken place here, the condition should be remedied at the earliest opportunity".

Mesarosh Vs. United States, 352 U.S. 1, 14, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956).

Respectfully Submitted.

MARIO SIMBAQUEBA BONILLA
PRO-SE
REG No. 78997-004
C.C.A. CORRECTIONAL FACILITY
P.O. DRAWER 30
MCRAE, GA 31055

# C E R T I F I C A T E   O F   S E R V I C E

**I HEREBY** certify that a true and correct copy of the foregoing was served by U.S. mail on this __24__ day of ___December___, 2009, first class mail, postage prepaid to the following parties:


1. Clerk Of The Court
   United States District Court
   Southern District Of Florida
   400 North Miami Avenue
   Room 8N09
   Miami, FL 33128-7716
   Certified Mail No. __7009__ / __2820__ / __0003__ / __6180__ / __8161__
   Number of Copies: __1__


2. CAROL HERMANN, AUSA
   MARC OSBORNE, AUSA
   UNITED STATES ATTORNEY'S OFFICE
   99 N.E. 4th Street
   Miami, FL 33132
   Certified Mail No. __7009__ / __2820__ / __0003__ / __6180__ / __8178__
   Number of Copies: __1__

/S/ _____
MARIO SIMBAQUEBA BONILLA
PRO-SE

# Exhibit "A"



**U.S. Department of Justice**

Office of Professional Responsibility

*950 Pennsylvania Avenue, N.W., Suite 3525*
*Washington, D.C. 20530*
*(202) 514-3365*

DEC 1 4 2009

Mario Simbaqueba Bonilla
Reg. No. 78997-004
P.O. Drawer 30
McRae, GA 31055

Re: F1000011

Dear Mr. Simbaqueba Bonilla:

   This is in response to your October 19, 2009 Freedom of Information Act request to this Office for records pertaining to certain Department of Justice attorneys.  We received your request on November 4, 2009.  It has been assigned request number F1000011.  Please refer to that number in any correspondence pertaining to this matter.

   After careful consideration of your request, I have decided to refuse to confirm or deny the existence of records responsive to your request.  Lacking an individual's consent, an official acknowledgment of an investigation, or an overriding public interest, even to acknowledge the existence of investigatory records pertaining to an individual would constitute a clearly unwarranted invasion of personal privacy pursuant to 5 U.S.C. §552(b)(6) and could reasonably be expected to constitute an unwarranted invasion of personal privacy pursuant to 5 U.S.C. §552(b)(7)(C).

   If you are not satisfied with this response, you may appeal in writing within sixty days of the date of this letter to the Director, Office of Information Policy.  Your letter and envelope should be marked "FREEDOM OF INFORMATION APPEAL" and addressed to:

> Office of Information Policy
> United States Department of Justice
> 1425 New York Ave., N.W.
> Suite 11050
> Washington, D.C. 20530-0001

Exhibit "B"



United States District Court
for the District of Columbia
Washington, D.C. 20001

Chambers of
Emmet G. Sullivan
United States District Judge

(202) 354-3260

April 28, 2009

<u>VIA FACSIMILE AND FEDEX</u>
The Honorable Richard C. Tallman, Chair
Judicial Conference Advisory Committee
on the Rules of Criminal Procedure
Attn: Rules Committee Support Office
Administrative Office of the U.S. Courts
One Columbus Circle, NE
Washington, DC 20054

Dear Judge Tallman:

I write to urge the Advisory Committee on the Rules of Criminal Procedure (the "Rules Committee") to once again propose an amendment to Federal Rule of Criminal Procedure 16 requiring the disclosure of all exculpatory information to the defense. My understanding is that on September 5, 2006, the Rules Committee voted eight to four to forward such an amendment to the Standing Committee on Rules of Practice and Procedure (the "Standing Committee").[1] However, the Department of Justice ("DOJ") strongly opposed the amendment and argued that a modification to the United States Attorneys' Manual – which added, for the first time, a section addressing federal prosecutors' disclosure obligations – would obviate the need for an amendment to the federal rule.

There were compelling reasons for eight of the twelve members of the Rules Committee to support the proposed amendment in September 2006. Those reasons are no less compelling today. Moreover, it has now been nearly three years since the United States Attorneys' Manual was modified to "establish[] guidelines for the exercise of judgment and discretion by attorneys for the government in determining what information to disclose to a criminal defendant pursuant to the government's disclosure obligations as set out in *Brady v. Maryland* and *Giglio v. United States* and its obligation to seek justice in every case."[2] While I recognize and respect the commitment and hard work demonstrated by federal prosecutors every day in courtrooms throughout the country, it is

---

[1] *See* Minutes of September 5, 2006 Special Session at 7, *available at* http://www.uscourts.gov/rules/Minutes/CR09-2006-min.pdf.

[2] *See* United States Attorneys' Manual § 9-5.000, Comment, *available at* http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/5mcrm.htm.

The Honorable Richard C. Tallman, Chair
April 28, 2009
Page 2

uncontroverted that *Brady* violations nevertheless occur.

Earlier this month, Attorney General Eric H. Holder, Jr., for whom I have the highest regard, took the highly unusual, if not unprecedented, step of moving to set aside the verdict and dismiss the indictment with prejudice in the case of *United States v. Theodore F. Stevens*, Criminal Action No. 08-231 (EGS) (D.D.C.). At a hearing on that motion, the government informed me that during the course of investigating allegations of misconduct, which included several discovery breaches, and preparing to respond to the defendant's post-trial motions, a new team of prosecutors had discovered what the government readily acknowledged were two serious *Brady* violations:

> THE COURT: All right. Let me ask you this, Counsel, and I need a very precise answer to this question. The Government counsel will concede, will it not, that the failure to produce the notes or information from the April 15, 2008 interview with Bill Allen in which he did not recall having a conversation with Bob Persons about sending a bill to the Senator was a *Brady* violation.

> MR. O'BRIEN: It was a *Brady* violation. It was impeaching material, and the Court knows that *Giglio* is a subset of *Brady*.

> THE COURT: Right.

> MR. O'BRIEN: Also, there was – I failed to mention this and I should have. The Court did mention it, but there was also information about the value of the work that was performed.

> THE COURT: And that was going to be the second question. Indeed, was that a *Brady* violation as well?

> MR. O'BRIEN: I believe that it was. At a minimum, it was favorable evidence to the Defense that should have been turned over pursuant to the instructions that Your Honor previously mentioned.

Motion Hrg. Tr. 13-14 (Apr. 7, 2009). These *Brady* violations – revealed for the first time five months after the verdict was returned – came to light only after an FBI agent filed a complaint alleging prosecutorial and other law enforcement misconduct, a new Attorney General took office, and a new prosecutorial team was appointed to respond to the defendant's post-trial motions. Attorney General Holder's response to these issues has been commendable, and I understand that he has since discussed instituting training for prosecutors regarding their discovery obligations and has publicly reminded prosecutors that their obligations to fairness and justice are paramount to all other concerns.[3] These developments provide further support for such an amendment.

---

[3] *See* Nedra Pickler, *U.S. Attorneys Told to Expect Scrutiny; Senator's Case Leaves Taint, Holder Says*, The Boston Globe, Apr. 9, 2009, at 8 ("'Your job as assistant U.S. attorneys is not to convict people,' said Holder. 'Your job is not to win cases. Your job is to do justice. Your job is in every case, every decision that you make, to do the right thing. Anybody who asks you to do

The Honorable Richard C. Tallman, Chair
April 28, 2009
Page 3

An amendment to Rule 16 that requires the government to produce all exculpatory information to the defense serves the best interests of the court, the prosecution, the defense, and, ultimately, the public. Such a rule would eliminate the need for the court to enter discovery orders that simply restate the law in this area, reduce discovery disputes, and help ensure the integrity and fairness of criminal proceedings. Moreover, such a rule would also provide clear guidance to the prosecutor and indeed protect prosecutors from inadvertent failures to disclose exculpatory information. Finally, a federal rule of criminal procedure mandating disclosure of such information – whether or not the information is requested by the defense – would ensure that the defense receives in a timely manner all exculpatory information in the government's possession.

The importance of the government's disclosure obligations cannot be overstated. Indeed, as articulated by the U.S. Supreme Court in *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999):

> In *Brady*, this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. [83, 87 (1963)]. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682; *see also Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." *Id.* at 438. In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles*, 514 U.S. at 437.

> These cases, together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

---

something other than that is to be ignored. Any policy that is in tension with that is to be questioned and brought to my attention. And I mean that.'" (quoting remarks by Attorney General Holder at a swearing-in ceremony)).

The Honorable Richard C. Tallman, Chair
April 28, 2009
Page 4

In a decision issued today, the Supreme Court reiterated these principles in equally strong terms. Both the language used by the Supreme Court, and the fact that the Court was faced with yet another case raising important *Brady* issues, strongly countenance in favor of the Rule 16 amendment previously proposed by the Rules Committee:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady*, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. *See Kyles*, 514 U.S. at 437 ("[T]he rule in *Bagley* (and, hence, in *Brady*) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)"). *See also* ABA Model Rule of Professional Conduct 3.8(d) (2008) ("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal"). As we have often observed, the prudent prosecutor will err on the side of transparency, resolving doubtful questions in favor of disclosure. *See Kyles*, 514 U.S., at 439; *U.S. v. Bagley*, 473 U.S. 667, 711, n. 4 (1985) (STEVENS, J., dissenting); *United States v. Agurs*, 427 U.S. 97, 108 (1976).

*Cone v. Bell*, No. 07-1114, slip. op. at 21 n.15 (U.S. Apr. 28, 2009).

A federal rule of criminal procedure requiring all exculpatory evidence to be produced to the defense would eliminate the need to rely on a "prudent prosecutor" deciding to "err on the side of transparency," *id.*, and would go a long way towards furthering "the search for the truth in criminal trials" and ensuring that "justice shall be done." *Strickler*, 527 U.S. at 281. I welcome the opportunity to discuss this issue further.

Respectfully,

Emmet G. Sullivan

cc:    Members of the Advisory Committee on the Rules of Criminal Procedure (via facsimile)
       The Honorable Eric H. Holder, Jr. (via facsimile)
       Counsel of record in *United States v. Theodore F. Stevens*, Criminal Action No. 08-231 (EGS) (D.D.C.) (via ECF)

## COMMITTEE ON RULES OF PRACTICE AND PROCEDURE

OF THE

### JUDICIAL CONFERENCE OF THE UNITED STATES

WASHINGTON, D.C. 20544

**LEE H. ROSENTHAL**
CHAIR

**CHAIRS OF ADVISORY COMMITTEES**

**PETER G. McCABE**
SECRETARY

**CARL E. STEWART**
APPELLATE RULES

July 2, 2009

**LAURA TAYLOR SWAIN**
BANKRUPTCY RULES

**MARK R. KRAVITZ**
CIVIL RULES

**RICHARD C. TALLMAN**
CRIMINAL RULES

Honorable Emmet G. Sullivan
United States District Court
4935 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

**ROBERT L. HINKLE**
EVIDENCE RULES

Re:    Your Letter Recommending an Amendment
to Federal Rule of Criminal Procedure 16

Dear Judge Sullivan:

I received your letter, dated April 28, 2009, requesting that the Criminal Rules Committee revive the proposal amending Rule 16 to require the prosecution to disclose any exculpatory information to the defense. We will indeed be considering the proposal; it is on the agenda for our October meeting in Seattle.

As I am sure you know, this matter is currently being reviewed at the highest levels of the executive branch. The Department of Justice has appointed an internal working group focused on the issue. That working group is co-chaired by Assistant Attorney General Lanny Breuer, who is also the Department's representative and an *ex-officio* member of the Criminal Rules Committee. I have received assurances that the Department will report back to the committee with its position on the issue by our October meeting.

We will keep you apprised of any action taken on the proposed amendment.

Sincerely,

*Richard C. Tallman*

Richard C. Tallman
Chair, Criminal Rules Committee

# Exhibit "C"

## Wire Request

Case Priority    0
Currency Type :    United States(USD)
Rep Code:    AK01
Amount:    9800.00
Bank Name:    SunTrust Bank
Bank Address:
City/State:
Bank Phone:
Destination:    USA
ABA #:    067006076
Swift Code:
Sort Code:
Bank FBO:    Christopher Harris
Bank Account#:    1000023834483
Further Credit To:
Customer's Name:
All Funds:    No
Is this an IRA Account?:    No
Supervisor:    No
LOA:    No
Are there Open Orders    No
VAX ID:    LAV037
Account #:    60248238
First Name:    CHRISTOPHER
Last Name:    harris
Request ID:    638028
Case ID:    040901-1005
Status:    Closed
Date Submitted:    09/01/04
Updated By:    marginsproc
Date:    09/08/04
Associate:    tsingh
Ext:    8900
Request Information
Customer Information
Cut-off to be processed today is 11:00 A.M PST.
Supervisor contacted if amount 100,000 or over
Notarized LOA in hand for name other
than account title .Wire Fee $25
Required Information
Comments:
Internal Notes:
Customer's Acct#:
comments    -waived $25 fee customer is in a hurricane zone and last
              thing he should worry about is our fees.  thanks
et_notes    please pend for 09/02
              Pended for review on 9/7/2004

tpaggi                              Page 1                        09/09/04 11:24AM

# Exhibit "D"



# Department of Justice

**PARA DIVULGACIÓN INMEDIATA**
**VIERNES, 11 DE ABRIL DE 2008**
**WWW.USDOJ.GOV**

**CRM**
**(202) 514-2007**
**TDD (202) 514-1888**

## Extranjero sentenciado a nueve años de prisión por ardid de fraude informático en centros de negocios hoteleros

WASHINGTON – Mario Simbaqueba Bonilla, 40, un ciudadano colombiano, fue sentenciado hoy a nueve años de prisión a raíz de una declaración de culpabilidad por una acusación formal de 16 cargos asociada a un complejo ardid de fraude informático con más de 600 víctimas, anunciaron hoy la Secretaria de Justicia Auxiliar Alice S. Fisher de la División de lo Penal, el Fiscal Federal Alex Acosta para el Distrito Sur de Florida, el Departamento de Defensa, el Servicio de Investigaciones Penales de Defensa [Defense Criminal Investigative Service (DCIS)], y el Servicio de Inspección Postal de los EE.UU. Simbaqueba Bonilla también fue sentenciado a tres años de libertad bajo supervisión después de ser liberado de prisión y al pago de una restitución de 347,000 dólares.

El 9 de enero de 2008, Simbaqueba Bonilla se declaró culpable de cargos de conspiración, fraude con dispositivo de acceso y robo de identidad agravado. Según las acusaciones y las declaraciones en el tribunal, Simbaqueba Bonilla, solo y con un coconspirador, realizó una compleja serie de intrusiones a computadoras, robos de identidad y fraudes con tarjetas de crédito diseñados para robar dinero de cuentas bancarias, de sueldo, y otras cuentas de sus víctimas. El Tribunal reconoció la pérdida buscada y concretada del ardid de 1.4 millones de dólares. Gran parte de la actividad de robo de identidad – iniciada por Simbaqueba Bonilla desde computadoras en Colombia – tuvo como víctimas a individuos residentes en los Estados Unidos, entre ellos personal del Departamento de Defensa. Simbaqueba Bonilla usó el dinero para comprar electrónicos costosos y viajes y alojamiento de lujo en diversos países, entre ellos Hong Kong, las islas Turks y Caicos, Francia, Jamaica, Italia, Chile y los Estados Unidos.

Simbaqueba Bonilla, como se esboza en la acusación formal y la información brindada en esta audiencia de declaración de culpabilidad, participó en una conspiración desde aproximadamente 2004 hasta 2007 que comenzó con la instalación ilegal de software de registro de pulsación de teclas en computadoras ubicadas en centros de negocios de hoteles y salas de Internet en todo el mundo. Este software detectaba la información personal de quienes usaban las computadoras, lo que incluía contraseñas y otra información de identificación personal que las víctimas usaban para acceder a sus cuentas de banco, sueldo, bolsa y otras cuentas en línea. Simbaqueba Bonilla usaba los datos que interceptaba de sus víctimas, que generalmente eran huéspedes de hoteles en todo el país, para robar o desviar dinero de sus cuentas a otras cuentas que había creado a nombre de otras personas que él había victimizado de la misma manera. Luego, a través de una compleja serie de transacciones electrónicas diseñada para cubrir sus huellas, Simbaqueba Bonilla transfería el dinero robado a tarjetas de crédito, efectivo o débito y hacía que las tarjetas fueran enviadas a él y a terceros a direcciones postales comerciales que él abría en todo el país.

Agentes federales arrestaron a Simbaqueba Bonilla cuando voló a los Estados Unidos en agosto de 2007. En el momento del arresto, Simbaqueba Bonilla viajaba con un pasaje aéreo comprado con fondos robados y tenía en su posesión una computadora portátil también comprada con fondos robados. La computadora portátil contenía los nombres, las contraseñas y otros datos personales y financieros de más de 600 personas.

Case 1:07-cr-20897-PCH   Document 97   Entered on FLSD Docket 12/29/2009   Page 50 of 94

Information Sources, Inc.

About Us | Contact Us

# TecTrends™

*Your Technology Information Resource*

---

BETA

## Search:

 **A** **Article Search** - Search periodical articles about companies, products, and technologies.
**View Noteworthy Articles** - See a selection of recently added articles.

---

**View Directories**          **Advanced Search**          **PRNewswire**

---

Ads by Google
Tec
Mario Party 8
Toshiba Tec 2500
Mario Lyrics
Mario Songs

 **Press Release**

## Foreign National Sentenced to Nine Years in Prison for Hotel Business Center Computer Fraud Scheme

WASHINGTON, April 11 /PRNewswire-USNewswire/ -- Mario Simbaqueba Bonilla, 40, a Colombian citizen, was sentenced today to nine years in prison, resulting from his guilty plea to a 16-count indictment involving a complex computer fraud scheme victimizing more than 600 people, Assistant Attorney General Alice S. Fisher of the Criminal Division, U.S. Attorney Alex Acosta for the Southern District of Florida, the U.S. Department of Defense, Defense Criminal Investigative Service (DCIS), and the U.S. Postal Inspection Service announced today. Simbaqueba Bonilla was also sentenced to three years supervised release upon his release from prison and ordered to pay restitution of $347,000.

On Jan. 9, 2008, Simbaqueba Bonilla pleaded guilty to charges of conspiracy, access device fraud and aggravated identity theft. According to the charges and in-court statements Simbaqueba Bonilla, alone and in concert with a co-conspirator, engaged in a complex series of computer intrusions, identity thefts, and credit card frauds designed to steal money from payroll, bank and other accounts of their victims. The Court recognized the attempted and actual loss from the scheme at $1.4 million. Much of the identity theft activity - initiated by Simbaqueba Bonilla from computers in Colombia - targeted individuals residing in the United States, including Department of Defense personnel. Simbaqueba Bonilla used the money to buy expensive electronics and luxury travel and accommodations in various countries, including Hong Kong, Turks and Caicos, France, Jamaica, Italy, Chile and the United States.

Simbaqueba Bonilla, as outlined in the indictment and information offered at his plea hearing, engaged in a conspiracy from approximately 2004 to 2007 that began with illegally installing keystroke logging software on computers located in hotel business centers and Internet lounges around the world. This software would collect the personal information of those who used the computers, including passwords and other personal identifying information the victims used to access their bank, payroll, brokerage and other accounts online. Simbaqueba Bonilla used the data he intercepted from his victims, who were typically guests at hotels throughout the country, to steal or divert money from their accounts into



FOX NEWS    CHANNEL FINDER    ON AIR    SIGN IN    REGISTER

# FOX BUSINESS

| | | |
|---|---|---|
| GET QUOTES | | |

HOME    VIDEO    MARKETS    PERSONAL FINANCE    OUR TEAM    MY MONEY

---

## Latest News

Friday, Apr. 11 2008

## Foreign National Sentenced to Nine Years in Prison for Hotel Business Center Computer Fraud Scheme

Rated Not yet rated

Rate This ☆☆☆☆☆    Recommend    E-mail this Story | Respond to Editor

PR Newswire
Comtex

 

WASHINGTON, April 11, 2008 /PRNewswire-USNewswire via COMTEX/ -- Mario Simbaqueba Bonilla, 40, a Colombian citizen, was sentenced today to nine years in prison, resulting from his guilty plea to a 16-count indictment involving a complex computer fraud scheme victimizing more than 600 people. Assistant Attorney General Alice S. Fisher of the Criminal Division, U.S. Attorney Alex Acosta for the Southern District of Florida, the U.S. Department of Defense, Defense Criminal Investigative Service (DCIS), and the U.S. Postal Inspection Service announced today. Simbaqueba Bonilla was also sentenced to three years supervised release upon his release from prison and ordered to pay restitution of $347,000.

**VIEW ARCHIVES**

### ADVERTISEMENTS

**Ethanol Stock News - GFET**
Invest Now! Ethanol, Biofuels, Green Energy, Alternative Energy Stock.
www.GulfEthanolCorp.com

**Sharp Tools, Flat Rate Pricing**
$9.95/Option or $4.95/Stock Trade, Any Size. Get Flat Rate Commission!
www.optionshouse.com

BUY A LINK HERE

On Jan. 9, 2008, Simbaqueba Bonilla pleaded guilty to charges of conspiracy, access device fraud and aggravated identity theft. According to the charges and in-court statements Simbaqueba Bonilla, alone and in concert with a co-conspirator, engaged in a complex series of computer intrusions, identity thefts and credit card frauds designed to steal money from payroll, bank and other accounts of their victims. The Court recognized the attempted and actual loss from the scheme at $1.4 million. Much of the identity theft activity - initiated by Simbaqueba Bonilla from computers in Colombia - targeted individuals residing in the United States, including Department of Defense personnel. Simbaqueba Bonilla used the money to buy expensive electronics and luxury travel and accommodations in various countries, including Hong Kong, Turks and Caicos, France, Jamaica, Italy, Chile and the United States.

Simbaqueba Bonilla, as outlined in the indictment and information offered at his plea hearing, engaged in a conspiracy from approximately 2004 to 2007 that began with illegally installing keystroke logging software on computers located in hotel business centers and Internet lounges around the world. This software would collect the personal information of those who used the computers, including passwords and other personal identifying information the victims used to access their bank, payroll, brokerage and other accounts online. Simbaqueba Bonilla used the data he intercepted from his victims, who were typically guests at hotels throughout the country, to steal or divert money from their accounts into other accounts he had created in the names of other people he had victimized in the same way. Then, through a complex series of electronic transactions designed to cover his trail, Simbaqueba Bonilla would transfer the stolen money to credit, cash or debit cards and have the cards mailed to himself and others at commercial mailing addresses he opened across the country.

Federal agents arrested Simbaqueba Bonilla when he flew into the United States in August 2007. At the time of his arrest, Simbaqueba Bonilla was flying on an airline ticket purchased with stolen funds, and had in his possession a laptop also purchased with stolen funds. That laptop contained the names, passwords, and other personal and financial information of more than 600 people.

The case was prosecuted jointly by Trial Attorney William Yurek of the Criminal Division's Computer Crime and Intellectual Property Section and Assistant U.S. Attorney Richard Domingues Boscovich of the U.S. Attorney's Office in Miami, who serves as the coordinator for the office's Computer Hacking and Intellectual Property Unit. The criminal investigation was conducted by agents of the U.S. Department of Defense, Defense Criminal Investigative Service and the U.S. Postal Inspection Service.

SOURCE U.S. Department of Justice

http://www.usdoj.gov
Copyright © 2008 PR Newswire. All rights reserved



### MOST READ/EMAILED & BLOGS

- Late-Day Rally Carries Market to Mixed Close
- NABE Survey Shows 30% Forecast Economy Will Shrink
- Oil, Gas Prices Climb to Record Highs
- Drivers Get Pinched as Gas Soars to Record Highs
- Bill Maher Refuses To Apologize



Switch to Scottrade & get up to $100 back. Use tools like SmartText. Start Now!

### FOX BUSINESS TOOLS

 Determine whether leasing or buying is the better overall investment strategy

 Figure out how different variables in lease deal affect your monthly payment

 Calculate the interest rate you'll be paying, factoring in fees along the way

**SEE ALL TOOLS**

Colombian Man Sentenced for Computer Fraud - Yahoo! News    Page 1 of 3

Case 1:07-cr-20897-PCH   Document 97   Entered on FLSD Docket 12/29/2009   Page 52 of 94

Yahoo!  My Yahoo!  Mail  More

New User? Sign Up  Sign In  Help

Search: [            ]          **Web Search**

**Home  U.S.  Business  World  Entertainment  Sports  Tech  Politics  Elections  Science  Health  Most Popular**

Tech Video  Internet  Gadgets  Digital A/V  Security  Apple/Macintosh  Linux/Open Source  Video Games  Markets

Search:              All News        [ Search ]  Advanced

# Colombian Man Sentenced for Computer Fraud





**Is Outsourcing a Security Risk?**
**Hackers Increasingly Target Browsers**
**Security Filters Often Flag Legit but Infected Sites**
**Hackers Attack Newest Windows Patch**
**PC World**

**TECHNOLOGY VIDEO**



**PlayStation to Play Videos**
ABC News

**China's Car Culture**
CNN

» All news video

**RELATED QUOTES**

| | | |
|---|---|---|
| ^IXIC | 2375.18 | -32.86 |
| ^IXK | 1105.69 | -13.80 |
| ^DJUSS | 477.67 | -8.36 |

[ Get Quotes ]

Delayed Data
Providers - Disclaimer

**YAHOO! NEWS TOPIC PAGES**

NEW! Get in-depth coverage on green technology and social networking with new topic pages.

Stephen Lawson, IDG News Service
Fri Apr 11, 8:40 PM ET

A Colombian man who used keylogging software in a lucrative identity theft scheme has been sentenced to nine years in prison and ordered to pay restitution of US$347,000.

Mario Simbaqueba Bonilla, 40, pleaded guilty in U.S. federal court in January to conspiracy, access device fraud and aggravated identity theft. His scheme, which he carried out alone and with a co-conspirator between 2004 and 2007, had more than 600 victims worldwide, including employees of the U.S. Department of Defense, according to the Department of Justice.

Bonilla installed keylogging software on hotel business-center computers and Internet lounges in order to steal passwords and other personal data. Then he and his partner used complex computer intrusion methods to steal money from accounts. After transferring the money to credit and debit cards or cash, Bonilla used it to buy electronics and pay for luxury travel to Hong Kong, France, Jamaica, the U.S. and other places, according to the Justice Department. The court pegged the actual and attempted losses from the scheme at $1.4 million.

Bonilla was arrested by federal agents last August when he flew into the U.S. with a laptop, purchased with stolen funds, that contained personal and financial information on more than 600 people.

In addition to the prison term and restitution, Bonilla was sentenced to three years of supervised release after his release.

ADVERTISEMENT

**WE MAKE STARTING YOUR ONLINE STORE EASY.**
Act now. 25% off for a limited time.
YAHOO! SMALL BUSINESS  Show me more

Email Story    IM Story    Printable View    Yahoo! Buzz

**RECOMMEND THIS STORY**
Recommend It:    Average (7 votes) ★★★★★    » Recommended Stories

**Technology News**              **Most Viewed - Technology**



**PLANETDATA**
THE SECURITY NEWS NETWORK

**HOMELAND SECURITY**

Homeland Security
Home Page
About
Articles
Events
Links
News
Partners
Resources

PlanetData:

Homeland Security ·

Home Page
About
Contributors
FAQ
Links
News
Press
Site Map
Tour
World News & Information

Members:

PlanetData members log in here

Log In
Register





IDGA
**Public Safety Communications** Summit

A roadmap to the Implementation of the National Public Safety Network

April 28-30, 2008
Washington, DC

**NEWS / Identity Theft**

## Man Sentenced for Hotel Computer Keystroke Logging Scam

Editor's summary:

**United States —** A Colombian national has been sentenced to nine years in a U.S. prison for a scam in which he placed keystroke logging software on computers in hotel business centers around the world and collected user-entered personal information. He then used this information to steal from the payroll, bank and other accounts of his victims. In all the Department of Justice estimates losses at about $1.4 million.

The sentenced man, Mario Simbaqueba Bonilla, pleaded guilty in January to charges of conspiracy, access device fraud and aggravated identity theft. Over a span of nearly four years he victimized more than 600 people, including employees of the U.S. Department of Defense.

From U.S. DOJ:

*"Much of the identity theft activity – initiated by Simbaqueba Bonilla from computers in Colombia – targeted individuals residing in the United States, including Department of Defense personnel. Simbaqueba Bonilla used the money to buy expensive electronics and luxury travel and accommodations in various countries, including Hong Kong, Turks and Caicos, France, Jamaica, Italy, Chile and the United States."*

**Go to Story...**

Posted by: Chef on Apr. 12, 2008 (11:24 am EST)

If you would like to comment on news stories, please log in.

***Comments:***

There are no news comments for this story.

Search:

Go!

Today's Top Read Story:
U.S. Army and Marines Accepting More Convicted Felons

National Threat Advisory:

**ELEVATED**

Significant Risk Of Terrorist Attacks

The threat level in the airline sector is HIGH or Orange.
More Info

Recent News:

Man Accused of Providing Terror Support

Feds to Expand DNA Collection to Arrestees

Second Mistrial in Sears Tower Terror Case

Immigration Raids at Poultry Plants in 5 States

Border Patrol Recruiting Spring Blitz Event

Man Arrested in Vegas Ricin Investigation

PlanetData and IACSP Launch New Counterterrorism Website

LAPD Launches New Counterterrorism Effort

ADVERTISEMENT



World News Map:
The World News Map displays news events from around the globe. Events are plotted over a map and sorted by date and topic.
More Info

---

The Security News Network™

**Global Security** | **Aviation Security** | **Corporate Security** | **Cyber Security** | **Homeland Security** | **Maritime Security** | **Law Enforcement** | **Intelligence**
**About** | **Advertising** | **Contact** | **Privacy Policy** | **Terms of Use**

All trademarks and copyrights on this page are owned by their respective owners. Comments are owned by the person who posts them.
The rest is copyright © 2004-2008 PlanetData, LLC. All rights reserved.



**HighBeam** Encyclopedia



Home | About Us | Contact Us | Help

Search: [_____] [Research] Search tips

Try our new beta site. Get a sneak peek now!

# Foreign National Sentenced to Nine Years in Prison for Hotel Business Center Computer Fraud Scheme

From: U.S. Newswire | Date: 4/11/2008

**Topics in the News:**



- Space: Final Frontier
- Barack Obama 2008
- U.S. Attorney Firings
- Celebrities Misbehaving

View more topics at Newser.

Newspaper

To:
TECHNOLOGY
EDITORS

Print    Digg    del.icio.us

**Florida's Karate Leader**
Get Fit, Get Tough, Train to be alert, confident and prepared.
karateamerica.info

**Aikido Florida Aikikai**
Martial arts summer camp for kids. Self-defense, Japanese arts, games.
www.HolidayParkMartialArts.com

**2 Million Volt Stun Gun**
Safest & Most Powerful In The World Drop Bad Guys In A Second Or Less
ShocknAweStunGuns.com/

**Vancouver Martial Arts**
Call Us For Kung Fu, Tai Chi And Self Defense Training For All Ages.
www.MoyKungFu.com

Ads by Google

Contact: U.S. Department of
Justice, +1-202-514-2007,
TDD: +1- 202-514-1888

WASHINGTON, April
11 /PRNewswire-
USNewswire/ -- Mario
Simbaqueba Bonilla, 40, a
Colombian citizen, was
sentenced today to nine years
in prison, resulting from his
guilty plea to a 16-count
indictment involving a complex computer fraud scheme victimizing more
than 600 people, Assistant Attorney General Alice S. Fisher of the
Criminal Division, U.S. Attorney Alex Acosta for the Southern District of ...

**Read all of this article with a FREE trial to HighBeam**

(This preview shows 498 of 3,689 characters)

Copyright 2008 U.S. Newswire
This material is published under license from the publisher through ProQuest Information and Learning Company,
Ann Arbor, Michigan. All inquiries regarding rights should be directed to ProQuest Information and Learning
Company.
For permission to reuse this article, contact Copyright Clearance Center.

Print    Digg    del.icio.us



**NewsBuzz**
We know the latest news!

Politics

Entertainment

Business

Tech

## Colombian Man Sentenced for Computer Fraud

### April 13 12:05:01 PM, Yahoo News

PC World - A Colombian man who used keylogging software in a lucrative identity theft scheme has been sentenced to nine years in prison...

Mario Simbaqueba Bonilla, 40, pleaded guilty in U.S. federal court in January to conspiracy, access device fraud and aggravated identity theft. His scheme, which he carried out alone and with a co-conspirator between 2004 and 2007, had more than 600 victims worldwide, including employees of the U.S. Department of Defense, according to the Department of Justice.

Bonilla installed keylogging software on hotel business-center computers and Internet lounges in order to steal passwords and other personal data. Then he and his partner used complex computer intrusion methods to steal money from accounts. After transferring the money to credit and debit cards or cash, Bonilla used it to buy electronics and pay for luxury travel to Hong Kong, France, Jamaica, the U.S. and other places, according to the Justice Department. The court pegged the actual and attempted losses from the scheme at $1.4 million.

Bonilla was arrested by federal agents last August when he flew into the U.S. with a laptop, purchased with stolen funds, that contained personal and financial information on more than 600 people.

In addition to the prison term and restitution, Bonilla was sentenced to three years of supervised release after his release.

Source

## Related articles

**Sony announces further delays to its PS3 virtual universe**
AFP - Sony's game unit said Tuesday it was delaying for the second time the launch of an online virtual universe for the PlayStation 3 because the service needs further development.

**Mobile banking gaining traction among younger customers**
AP - Most Americans are still hesitant about banking with their cell phones and PDAs, but young people are increasingly coming around to the idea of mobile banking, according to a new survey.

**FBI Concerned About Implications of Counterfeit Cisco Gear**
SpicyBrownMustard writes "An FBI PowerPoint presentation provides details about a criminal investigation into counterfeit CISCO hardware originating from China, and sold by Gold/Silver partners to numerous...

**Cyber Defense Competition Has A New Champion**
lisah writes "Several colleges across the country went head-to-head in San Antonio, Texas last weekend at the National Collegiate Cyber Defense Competition to see which team could best protect their networks...

**AT&T 1Q profit up 22 percent on strong wireless growth**
AP - AT&T Inc.'s first-quarter earnings rose 22 percent as its wireless division saw continued strong growth and the enterprise services division reversed a slide, the company said Tuesday.

Fujitsu HDD with AES 256-bit Encryption

Ads by Google

**10 Rules to Cut Belly Fat**
Lose 9 lbs every 11 Days with these 10 Idiot Proof Rules of Fat Loss.
www.FatLoss4Idiots.com

**Salary Of Paralegals**
Visit The Top 5 Websites For Salary Of Paralegals Here.
ParalegalTraining.FactsCenter.net

**Paralegal Training Online**
Designed for College Graduates Request Brochure and Salary Survey
www.AmericanParalegal.edu

**Become a Paralegal**
Accredited Paralegal Studies. Many Locations Online or Near You!
EverestCollege.Edu-Career.org

**Improve Gas Mileage 60%**
Convert Your Car To Run On Water. Save Fuel And Double Your Mileage!
www.RunYourCarWithWater.Com

**Politics News**

Iraq PM chides neighbors for lack of support
Panel says link between smog and premature death is clear
Pennsylvania votes in must-win for Clinton
Writers guild president presses Congress over Web freedoms
Pregnant bank teller shot during Ind. robbery
John McCain gets tax-free disability pension
UN summit to tackle 'tsunami' of rising food prices
Dearer food unleashes silent tsunami: U.N. says
Mental evaluation sought for student accused in bomb plot
2 men cleared of trying to cash corpse's check in NYC

**Entertainment News**

Tribeca Film Festival undergoes a bit of refurbishing
Nokia signs Sony BMG for free music offering
Former Bush press secretary Tony Snow joins CNN as pundit
Pacino and De Niro. How the mighty have fallen
Israel says Streisand won't attend 60th anniversary bash
Nokia signs Sony BMG for free music offering
Filmmaker collaborating with FBI on civil rights cases
Florez wows crowd at Met with 18 high Cs
'American Idol': Andrew Lloyd Webber week
Fitting Foundations for Chantelle Face Stephanie Seymour

**Business News**

Oil pushes past $118
Stocks edge lower on profit concerns
Lenders derail plan to let bankruptcy judges modify mortgages
CME profit falls short on thinner margins
Bank of America to alter



You can do more when your phone runs Windows.

Start doing more

Windows Mobile

About   Contacts   Subscribe   Advertise   Jobs   Site map   PDA   RSS

Home | **News** | Analysis   Comment   Reviews   Blogs   Audio/video

SEARCH   IT Week   Google

 

IT Week > News > Hacking

# Colombian cyber-crook jailed for nine years

## Man guilty of $1.4m fraud

Clement James, vnunet.com, 14 Apr 2008

A Colombian citizen has been sentenced to nine years in prison for a complex computer fraud which affected more than 600 people.

Mario Simbaqueba Bonilla, 40, was also sentenced to three years supervised release on his exit from prison, and ordered to pay restitution of $347,000.

Simbaqueba Bonilla pleaded guilty in January to charges of conspiracy, access device fraud and aggravated identity theft.

According to the charges Simbaqueba Bonilla, alone and in concert with a co-conspirator, engaged in a complex series of computer intrusions, identity thefts and credit card frauds designed to steal money from payroll, bank and other accounts.

The court recognised the attempted and actual loss from the scheme at $1.4m.

Much of the identity theft, initiated from computers in Colombia, targeted individuals residing in the US, including Department of Defense personnel.



**NETWORKWORLD**
Tuesday, April 22, 2008

Mario Simbaqueba                    Search



Your complete source of security intelligence.

CISCO



RECEIVE AN
ELECTRONIC
SUBSCRIPTION

CLICK HERE

Home

News

Research Centers

Security
- Anti-Virus / Spyware / Spam
- Compliance & Regulation
- Firewalls / VPNs / Intrusion
- NAC
- Services
- Cisco Security Watch
- Microsoft Security Watch

LANs & WANs

VoIP & Convergence

Network Management

Wireless & Mobile

Software

Data Center

Small Business Networking

Cisco Subnet

Microsoft Subnet

IT Careers

IT Buyer's Guides

Events

Site Resources

Clear Choice Tests

Opinions

Blogs

Newsletters

Podcasts

Videos

Chats

This Week in Print

White Papers

---

Security

# Colombian man sentenced for computer fraud

By Stephen Lawson, IDG News Service, 04/12/2008

Share/Email     Comment     Print                              IT Buyer's Guides

A Colombian man who used keylogging software in a lucrative identity theft scheme has been sentenced to nine years in prison and ordered to pay restitution of US$347,000.

Mario Simbaqueba Bonilla, 40, pleaded guilty in U.S. federal court in January to conspiracy, access device fraud and aggravated identity theft. His scheme, which he carried out alone and with a co-conspirator between 2004 and 2007, had more than 600 victims worldwide, including employees of the U.S. Department of Defense, according to the Department of Justice.

New! Watch this Network World Webcast - Discover how to Create an Orchestrated Data Center through Virtualization

Bonilla installed keylogging software on hotel business-center computers and Internet lounges in order to steal passwords and other personal data.(Compare Anti-spyware products.) Then he and his partner used complex computer intrusion methods to steal money from accounts. After transferring the money to credit and debit cards or cash, Bonilla used it to buy electronics and pay for luxury travel to Hong Kong, France, Jamaica, the U.S. and other places, according to the Justice Department. The court pegged the actual and attempted losses from the scheme at $1.4 million.

Bonilla was arrested by federal agents last August when he flew into the U.S. with a laptop, purchased with stolen funds, that contained personal and financial information on more than 600 people.

Want to compare security products? Visit the IT Buyer's Guides now.



WHAT DO YOU HAVE TO SAY?     hp

### Related Articles

SugarCRM, NetSuite get boost from BT deal

Kenya to issue infrastructure licenses

Yahsat plans satellite system for Middle East, Africa

Online privacy: railing against the accepted

Web 2.0 market to reach $4.6 billion by 2013

inform



**Get instant email notification** when white papers, webcasts, executive guides are added to our library. Stay informed and up-to-date with the latest on IT Technologies with Network World's Resource Alerts.

### Whitepapers

Best Practices in Lifecycle Management: Comparing KACE (tm), Altiris, LANDesk, and Microsoft SMS

Advances in Endpoint Data Security: New Technology to Meet Security, Operations, and Compliance Needs

The Distributed Enterprise: Access and Management of Remote Office IT Infrastructure

View more SECURITY whitepapers

### Webcasts

**Most Read**

5 IT skills that won't boost your salary

Wanted: 10 IT skills employers need today

25 radical network research projects

Microsoft, Novell making more noise in China

20 free software favorites

View more Most Read

Videos

Latest News

---

**IT Buyer's Guides**

Looking for security
Buyer's Guides?

Messaging Security Product Reviews, White Papers and Guides

Security Information Management Product Comparisons & Reviews

Client Management Product Comparisons & Reviews

View All Buyer's Guides

---

**Newsletters**

Some of our Security newsletters:

☐ Security: Threat Alert

☐ Security Strategies

☐ Security Alert

☐ Security: Identity Management Alert

☐ Security: Network Access Control Alert

☐ Compliance Alert

☐ Unified Communications Alert

☐ Network World Daily

Your email

Subscribe

View all newsletters

---

**Sponsored Links**

Key Elements to an Effective Business Continuity P...
Learn to develop a plan that clarifies what is critical and sets specific recove...

Buy a link now

print      e-mail      link                    RSS    technorati  [G] Blog search    share it    Blog it

## Foreign National Sentenced to Nine Years in Prison for Hotel Business Center Computer Fraud Scheme

WASHINGTON, April 11 /PRNewswire-USNewswire/ -- Mario Simbaqueba Bonilla, 40, a Colombian citizen, was sentenced today to nine years in prison, resulting from his guilty plea to a 16-count indictment involving a complex computer fraud scheme victimizing more than 600 people, Assistant Attorney General Alice S. Fisher of the Criminal Division, U.S. Attorney Alex Acosta for the Southern District of Florida, the U.S. Department of Defense, Defense Criminal Investigative Service (DCIS), and the U.S. Postal Inspection Service announced today. Simbaqueba Bonilla was also sentenced to three years supervised release upon his release from prison and ordered to pay restitution of $347,000.

On Jan. 9, 2008, Simbaqueba Bonilla pleaded guilty to charges of conspiracy, access device fraud and aggravated identity theft. According to the charges and in-court statements Simbaqueba Bonilla, alone and in concert with a co-conspirator, engaged in a complex series of computer intrusions, identity thefts, and credit card frauds designed to steal money from payroll, bank and other accounts of their victims. The Court recognized the attempted and actual loss from the scheme at $1.4 million. Much of the identity theft activity - initiated by Simbaqueba Bonilla from computers in Colombia - targeted individuals residing in the United States, including Department of Defense personnel. Simbaqueba Bonilla used the money to buy expensive electronics and luxury travel and accommodations in various countries, including Hong Kong, Turks and Caicos, France, Jamaica, Italy, Chile and the United States.

Simbaqueba Bonilla, as outlined in the indictment and information offered at his plea hearing, engaged in a conspiracy from approximately 2004 to 2007 that began with illegally installing keystroke logging software on computers located in hotel business centers and Internet lounges around the world. This software would collect the personal information of those who used the computers, including passwords and other personal identifying information the victims used to access their bank, payroll, brokerage and other accounts online. Simbaqueba Bonilla used the data he intercepted from his victims, who were typically guests at hotels throughout the country, to steal or divert money from their accounts into other accounts he had created in the names of other people he had victimized in the same way. Then, through a complex series of electronic transactions designed to cover his trail, Simbaqueba Bonilla would transfer the stolen money to credit, cash or debit cards and have the cards mailed to himself and others at commercial mailing addresses he opened across the country.



# PCWorld

Search PC World

Home | News | Hardware Reviews | Software Reviews | How-To | Videos | Downloads | Shop & Compare | Community | Business Center

**Magazine**
Subscribe & Get a Bonus CD
Customer Service

PCWorld BEST FREE STUFF

Best in the PC-World!
w/45nm QX9775 8-Cores
Quad SLI 9800 GX2!



# Business Center  Smart Technology for Smart Companies

Newsletters   RSS

TOPICS: Software / Services   Office Hardware   Security   Servers / Storage   Cell Phones / VoIP   Operating Systems   Networking   Business Continuity
PRESENTED BY CDW

PC World : Business Center : Security : News

# Colombian Man Sentenced for Computer Fraud

Stephen Lawson, IDG News Service

Friday, April 11, 2008 5:40 PM PDT

A Colombian man who used keylogging software in a lucrative identity theft scheme has been sentenced to nine years in prison and ordered to pay restitution of US$347,000.

Mario Simbaqueba Bonilla, 40, pleaded guilty in U.S. federal court in January to conspiracy, access device fraud and aggravated identity theft. His scheme, which he carried out alone and with a co-conspirator between 2004 and 2007, had more than 600 victims worldwide, including employees of the U.S. Department of Defense, according to the Department of Justice.

Bonilla installed keylogging software on hotel business-center computers and Internet lounges in order to steal passwords and other personal data. Then he and his partner used complex computer intrusion methods to steal money from accounts. After transferring the money to credit and debit cards or cash, Bonilla used it to buy electronics and pay for luxury travel to Hong Kong, France, Jamaica, the U.S. and other places, according to the Justice Department. The court pegged the actual and attempted losses from the scheme at $1.4 million.

Bonilla was arrested by federal agents last August when he flew into the U.S. with a laptop, purchased with stolen funds, that contained personal and financial information on more than 600 people.

In addition to the prison term and restitution, Bonilla was sentenced to three years of supervised release after his release.

Recommend this story?
20 Yes
1 No

Vote   Vote

**RELATED ARTICLES:**

China Faced With Growing Botnet Problem

Microsoft Data Show Web Attacks Taking off

Blue Coat to Acquire Packeteer for $268 Million

Economic Woes Won't Affect Europe Security Spending

Chinese Hackers Drop CNN Vendetta

**RELATED TERMS:**

Mario Simbaqueba Bonilla
U.S. Department of Justice
U.S. Department of Defense
Criminal Sentencing and Punishment
Science and Technology
Technology
Software

**FIND A REVIEW**

Select Category

Send documents easily.
Adobe Acrobat 8
Adobe

## Security News

Security - April 22, 2008
### China Faced With Growing Botnet Problem
China faces a growing threat from botnets, networks of computers infected with software that allows them to be controlled.

Security - April 22, 2008
### Microsoft Data Show Web Attacks Taking off
Criminals changed tactics in the last six months of 2007, dropping malicious e-mail in favor of Web-based attacks, according...

Security - April 21, 2008
### Blue Coat to Acquire Packeteer for $268 Million
Security and wide-area network acceleration company Blue Coat Systems has made a deal to buy Packeteer, a longtime WAN...

Security - April 21, 2008
### Economic Woes Won't Affect Europe Security Spending
Western Europe will increase spending on IT security products despite the shaky economic conditions caused by the credit...

More

**Desktop security multiplied**
with Intel vPro Processor Technology
-> a resource center presented by Intel



## Latest Expert Blogs

Neil McAllister on Software - April 20, 2008 9:47 AM
### Microsoft Mulls Subscriptions, Ads for Office Apps
New business models could have you paying monthly fees for productivity software -- or nothing at all.

Glenn Fleishman on Hardware - April 21, 2008 4:29 PM
### Fujitsu Ups Ante on Integral Hard Disk Encryption
A new drive shipping next month from Fujitsu increases hardware-based encryption strength, and offers a range of capacities up to 320 GB.

## Community Comments

Sign in to post a comment. New to PC World Comments? Register here.

## News For Your Business

China Faced With Growing Botnet Problem

Microsoft Data Show Web Attacks Taking off

Blue Coat to Acquire Packeteer for $268 Million

Rock Phish Gang Adds Second Punch to Phishing Attacks

Digital Ballot Ban Sought

Foreign National Sentenced to Nine Years in Prison for Hotel Business Center Computer Fraud Scheme ...




**SYS-CON MEDIA**
WWW.SYS-CON.COM

[ Search ]   Jump to a SYS-C

The i-Technology Media!

HOME  SUBSCRIBE  ADVERTISE  FREE NEWSLETTERS  SYS-CON.TV  EVENTS  WEBCAST

WELCOME TO **HELLO SECURE WORLD** — WRITE SAFER CODE - BUILD SAFER NET - SURF SAFER WEB   CHECK IT OUT NOW >>>

SOA CONFERENCE & EXPO   JUNE 23-24, 2008 NEW YORK

.NET · AJAX · ECLIPSE · FLEX · OPEN WEB · iPHONE · JAVA · LINUX · OPEN SOURCE · ORACLE · PBDJ · SEARCH · SILVERLIGHT · SOA · VIDEO · VIRTUALIZATION · WEB 2.0 · WIRELESS · XML

**YOUR FEEDBACK**

**Memory Caching in WAS**
was5118 wrote: Authors do not mention the SampleCacheCommand class must im...
Apr. 22, 2008 10:51 AM

**SOA World 2008 East $200 Savings Expire May 2nd — Register Today!**

**SYS-CON.TV**
Did you read today's **front page stories** & breaking news?


Your company uses **open source** software   Python Tcl

Live Google News by SYS-CON!

**TOP THREE LINKS YOU MUST CLICK ON**

▶ **2008 JavaOne℠ Conference**, May 6-9. Save $100
▶ **Coverity Whitepaper** — Eliminate Concurrency Defects
▶ **eBay** Developers Conference, 6/16-6/18 — Save $245!

**Meet Windows Server 2008.** The server unleashed.

**FootPrints Software**
Free Trial Now Available for Numara FootPrints 8! www.NumaraSoftware.com

Ads by Google

From the Wires

# Foreign National Sentenced to Nine Years in Prison for Hotel Business Center Computer Fraud Scheme

By: PR Newswire
Apr. 11, 2008 10:28 PM
Digg This!

  READ ARTICLE    PRINT    E-MAIL    BLOG


Webcasts: **Adobe** Transforming the User Experience   **Azul** Jav

SYS-CON FEATURED WHITEPAPERS

📄 Extend the value of your mainframe using SOA
📄 Fast, low-latency JMS messaging: Free download
📄 Coverity Whitepaper – Eliminate Concurrency Defects
📄 Improving .NET Application Performance & Reliability
📄 Extended Validation – the New Standard in SSL

 WASHINGTON, April 11 /PRNewswire-USNewswire/ -- Mario Simbaqueba Bonilla, 40, a Colombian citizen, was sentenced today to nine years in prison, resulting from his guilty plea to a 16-count indictment involving a complex computer fraud scheme victimizing more than 600 people, Assistant Attorney General Alice S. Fisher of the Criminal Division, U.S. Attorney Alex Acosta for the Southern District of Florida, the U.S. Department of Defense, Defense Criminal Investigative Service (DCIS), and the U.S. Postal Inspection Service announced today. Simbaqueba Bonilla was also sentenced to three years supervised release upon his release from prison and ordered to pay restitution of $347,000.

On Jan. 9, 2008, Simbaqueba Bonilla pleaded guilty to charges of conspiracy, access device fraud and aggravated identity theft. According to the charges and in-court statements Simbaqueba Bonilla, alone and in concert with a co-conspirator, engaged in a complex series of computer intrusions, identity thefts, and credit card frauds designed to steal money from payroll, bank and other accounts of their victims. The Court recognized the attempted and actual loss from the scheme at $1.4 million. Much of the identity theft activity - initiated by Simbaqueba Bonilla from computers in Colombia - targeted individuals residing in the United States, including Department of Defense personnel. Simbaqueba Bonilla used the money to buy expensive electronics and luxury travel and accommodations in various countries, including Hong Kong, Turks and Caicos, France, Jamaica, Italy, Chile and the United States.

Simbaqueba Bonilla, as outlined in the indictment and information offered at his plea hearing, engaged in a conspiracy from approximately 2004 to 2007 that began with illegally installing keystroke logging software on computers located in hotel business centers and Internet lounges around the world. This software would collect the personal information of those who used the computers, including passwords and other personal identifying information the victims used to access their bank, payroll, brokerage and other accounts online. Simbaqueba Bonilla used the data he intercepted from his victims, who were typically guests at hotels throughout the country, to steal or divert money from their accounts into other accounts he had created in the names of other people he had victimized in the same way. Then, through a complex series of electronic


**BlackBerry**
**REGISTER NOW** for the
**AT&T devCentral WEBCAST SERIES**
**Best Practices for BlackBerry® Development**
at&t

**LATEST STORIES ON SYS-CON.COM**

**AJAX World - Backbase Introduces Customer Engagement 2.0**
By RIA News Desk
Backbase introduced Customer Engagement 2.0, rich
Apr. 22, 2008 11:45 AM

**3PAR Named "Silver Sponsor" of SYS-CON's Virtualization Conference & Expo**
By Virtualization News Desk
3PAR is a provider of utility storage, a category



APPROVED

 

Gulfport, MS
Intermittent clouds
71°F

Welcome Guest
Login | Register | Sign in to Chat(Auth.)

Search    SunHerald.com    Archives    Web Search powered by YAHOO! SEARCH    Go

Jobs
Cars
Real Estate
Apartments
Local Shopping
All Classifieds
Create an Ad
Create a Free Ad
Find an Ad
Dating



e.g. registered nurse

Biloxi, MS

[Search]

News

ONLINE EXTRAS
Newsletters
Videos
Discussion Boards
Maps & Directions
Newspaper Ads
Online
Past Articles
RSS Headlines
Today's Newspaper
Yellow Pages

SITE SERVICES
Contact Us
Products & Services

Home : Business : Press Releases : PR Newswire

## Press Releases: PR Newswire

Posted on Fri, Apr. 11, 2008

Resize text

email   print

BOOKMARK

### Foreign National Sentenced to Nine Years in Prison for Hotel Business Center Computer Fraud Scheme

By U.S. Department of Justice

WASHINGTON, APRIL 11 — Mario Simbaqueba Bonilla, 40, a Colombian citizen, was sentenced today to nine years in prison, resulting from his guilty plea to a 16-count indictment involving a complex computer fraud scheme victimizing more than 600 people, Assistant Attorney General Alice S. Fisher of the Criminal Division, U.S. Attorney Alex Acosta for the Southern District of Florida, the U.S. Department of Defense, Defense Criminal Investigative Service (DCIS), and the U.S. Postal Inspection Service announced today. Simbaqueba Bonilla was also sentenced to three years supervised release upon his release from prison and ordered to pay restitution of $347,000.

MOST-READ STORIES
• Thirty-one months in the making, a new COAST STYLE
• Guard's murder a mystery
• NEW RESTAURANTS
• We got a bit 2 in Garage County
• LETTERS TO THE EDITORS
• AROUND SOUTH day by day
• Favre answers 3 in Herald questions about retirement
• Prostitution sting in Pascagoula nets 9 more
• Sound Off
• DUI Zone in vote



M&M
MERCHANTS & MARINE
BANK
228-762-3311
www.MandMBank.com

Health Insurance Options You Can Afford

Is Your Computer Slower Than When You Bought It?

Building Strength and Muscle without Illegal Substances

On Jan. 9, 2008, Simbaqueba Bonilla pleaded guilty to charges of conspiracy, access device fraud and aggravated identity theft. According to the charges and in-court statements Simbaqueba Bonilla, alone and in concert with a co-conspirator, engaged in a complex series of computer intrusions, identity thefts, and credit card frauds designed to steal money from payroll, bank and other accounts of their victims. The Court recognized the attempted and actual loss from the scheme at $1.4 million. Much of the identity theft activity - initiated by Simbaqueba Bonilla from computers in Colombia - targeted individuals residing in the United States, including Department of Defense personnel. Simbaqueba Bonilla used the money to buy expensive electronics and luxury travel and accommodations in various countries, including Hong Kong, Turks and Caicos, France, Jamaica, Italy, Chile and the United States.

Simbaqueba Bonilla, as outlined in the indictment and information offered at his plea hearing, engaged in a conspiracy from approximately 2004 to 2007 that began with illegally installing keystroke logging software on computers located in hotel business centers and Internet lounges around the world. This software would collect the personal information of those who used the computers, including passwords and other personal identifying information the victims used to access their bank, payroll, brokerage and other accounts online. Simbaqueba Bonilla used the data he intercepted from his victims, who were typically guests at hotels throughout the country, to steal or divert money from their accounts into other accounts he had created in the names of other people he had victimized in the same way. Then, through a complex series of electronic transactions designed to cover his trail, Simbaqueba Bonilla would transfer the stolen money to credit, cash or debit cards and have the cards mailed to himself and others at commercial mailing addresses he opened across the country.

Federal agents arrested Simbaqueba Bonilla when he flew into the United States in August 2007. At the time of his arrest, Simbaqueba Bonilla was flying on an airline ticket purchased with stolen funds, and had in his possession a laptop also purchased with stolen funds. That laptop contained the names, passwords, and other personal and financial information of more than 600 people.

The case was prosecuted jointly by Trial Attorney William Yurek of the Criminal Division's Computer Crime and Intellectual Property Section and Assistant U.S. Attorney Richard Dominguez Boscovich of the U.S. Attorney's Office in Miami, who serves as the coordinator for the office's Computer Hacking and Intellectual Property Unit. The criminal investigation was conducted by agents of the U.S. Department of Defense, Defense Criminal Investigative Service and the U.S. Postal Inspection Service.

SOURCE U.S. Department of Justice

U.S. Department of Justice, +1-202-514-2007, TDD: +1-202-514-1888,



Exhibit "E"

FEB-16-2005 15:00  FROM:CORPORATE SECURITY 7705336047          TO:912054205722          P:4-6

02/16/05  WED 11:07 FAX 7067787818          REGIONS BANK          ☎003



# Regions Bank

**Affidavit of Unauthorized/Improper ACH Debit Activity** *credit*

I, **HABERSHAM OB GYN** _____ , hereby declare and swear under oath that I
                              Consumer

have knowledge that an automated clearing house (ACH) debit entry was/will be charged to my account number

**6579508063** , at **REGIONS BANK** _____ , on or about
                        Financial Institution

**08/30/2004** , by **E TRADE EXPY** _____ , in the amount of
                      Company

**0.31** , and that the debit was/will be unauthorized or improper.

## Unauthorized
The entry should be returned because: (check one)
- ☒ I did not sign a written authorization with the company. (R10)
- ☐ I revoked the authorization with the company in the manner specified in the original authorization. (R07)
- ☐ the entry was/will be for more than the amount I authorized. (R10)
- ☐ the entry was/will be debited to my account earlier than I authorized. (R10)

## Improper
The entry should be returned because: (check one)

A) ☐ The notice stating the terms of the re-presented check (referred to as RCK) entry policy or truncated check entry policy was not provided to me in advance of receiving the item to which the re-presented check entry, or PPD Accounts Receivable Truncated Check Debit Entry relates. (R51)

B) ☐ The item which the represented check entry (RCK), or PPD Accounts Receivable Truncated Check Debit Entry relates, was ineligible because either: (check one) (R51)
- ☐ is not an item within the meaning of Revised Article 4 of the Uniform Commercial Code (1990); (R51) (excludes non-cash items, drafts drawn on the US Treasury, a Federal Reserve Bank, Federal Home Loan Bank, state or local government, US Postal Service money orders, non-US currency items, third-party items, demand drafts and third party drafts without Receiver's signature)
- ☐ is not a negotiable demand draft drawn on or payable through or at a Participating DFI, other than a Federal Reserve Bank or a Federal Home Loan Bank; (R51)
- ☐ is in an amount of $2,500 or more; (RCK only) (R51)
- ☐ does not indicate on the face of the document that the item was returned due to Not Sufficient Funds, NSF, Uncollected Funds or comparable language; (RCK only) (R51)
- ☐ is dated more than 180 days from the date the entry was transmitted to the RDFI; (R51)
- ☐ is drawn on a non-consumer account; (R01)
- ☐ has been previously presented (a) more than twice in paper form (for initial represented check entries) or (b) more than once in paper form and more than once as a re-presented check entry (for reinitiated represented check entries). (R51)
- ☐ has been previously presented in its physical form PPD Accounts Receivable Truncated Check Debit Entry only. (R51)
- ☐ has been presented more than three times PPD Accounts Receivable Truncated Check Debit Entry only. (R51)
- ☐ has not been completed and signed by the consumer PPD Accounts Receivable Truncated Check Debit Entry only. (R51)

C) ☐ All signatures on the item to which the re-presented check entry (RCK), or PPD Accounts Receivable Truncated Check Debit Entry relates are not authentic or authorized. (R51)

D) ☐ The item to which the re-presented check entry (RCK), or PPD Accounts Receivable Truncated Check Debit Entry relates has been altered. (R51)

E) ☐ For PPD Accounts Receivable Truncated Check Debit Entries only, the Receiver provided the Originator with notice not to truncate the item to which the entry relates. (R51)

I further declare that the debit transaction was not originated with fraudulent intent by me or any person acting in the concert with me, and that the signature below is my own proper signature.

Signature _____          Dated: 09/07/2004
                  Consumer

Acknowledged by financial institution:

Dated: **09/07/2004** _____    Name: **JOY L BROOKSHIRE** _____

Signature _____
                  Financial Institution Representative

Phone Number: **7067780207** _____    Location: **Habersham Main Office**

### FAX To:  ACH Department  (205) 420-5872

Affidavit Unauthorized ACH.doc
08/2004

# Exhibit "F"

| Bank/Victim | Actual Dollar Harm | Failed Attempted Dollar Harm | Description of Incident of Dollar Harm |
|---|---|---|---|
| 1. WMBFA/WMBFA (WAMU) 389-183465-4* | $9,557.00 | $0.00 | Actual dollar harm was caused to WMBFA because Nelya Valero opened an account and deposited checks that were later NSF and were not recovered. (A1 and A2) |
| 2. E*trade #60489223/BANK OF AMERICA ACCOUNT #9465916482/ WACHOVIA BANK ACCOUNT #65387602* | 0.00 | 5,000.00 | Attempted Dollar harm occurred when Neyla Valero and Simbaqueba (Boger) opened two accounts and deposited unauthorized ACH amounts from two account holders (one from Bank of America and the other from Wachovia). E*Trade was able to return the funds with no loss. (a3) |
| 3. Ameritrade/Galileo Processing @ Zions First National Bank/ Account 021125612* | 0.00 | 152,500.00 | Attempted Dollar harm occurred when Simbaqueba attempted to fund an AmeriTrade account with unauthorized ACH from a Zions First National Bank account. The amount of $150,000 was actually transferred, but then recovered and an additional $2,500 was attempted and rejected before transfer. (a4) |
| 4. AmeriTrade/ # rajeev114 162-642235/Centennial Bank* | $4.17 | 2,495.83 | Attempted dollar harm occurred when the same IP address identified in the transactions above (linked to Simbaqueba) made an unauthorized ACH from an Ameritrade account to Centennial Bank account for a Wired Plastic account in the name of Michael Korte. Michael Korte's name and SSN were listed on the information in Simbaqueba's possession at the time of arrest. Ameritrade was able to recover a majority of the funds from Centennial Bank and incurred dollar harm for the remaining amount. (a4) |
| 5. Ameritrade/ # T. Van Note 881-585928* | 0.00 | 1,980.00 | Attempted dollar harm occurred when the same IP address identified in the transactions above (linked to Simbaqueba) attempted to make an unauthorized ACH transfer to a Centennial Account. Ameritrade cancelled the ACH before it was made and no dollar harm incurred. (a4) |
| 6. Chase Credit Card | 91,320.29 | 0.00 | Actual dollar harm occurred for Chase Credit Card company when Simbaqueba opened 50 fraudulent credit cards and charged 91,689.59 to those accounts. Simbaqueba is linked to those accounts by having himself or Neyla Valero as authorized users on each account. (a37 and a38). Chase was able to recover $11,752.12 of the dollar harm from their vendors. We removed dollar harm from Chase for $99.90 for SpectorSoft to avoid a potential duplication of dollar harm. The vendors are then affected by the $11,752.12 dollar harm. No evidence was provided that the vendors were able to recover the funds from Simbaqueba. Chase provided a list of fraudulent transactions related to those account numbers. Based on the vendors listed, there was one charge for "GoToMyPC" for $269.40 that GoToMyPC lists as a chargeback. This amount has been removed from the Chase actual dollar harm to avoid duplication. The other charges are not duplicated with the other victims listed on this spreadsheet. |

| Bank/Victim | Actual Dollar Harm | Failed Attempted Dollar Harm | Description of Incident of Dollar Harm |
|---|---|---|---|
| 7. US Bank/Evan Wortman 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* | 0.00 | 13,500.00 | Attempted dollar harm occurred when a bill payee to Neyla Valero was added to a US Bank account. An IP address from Columbia then attempted to pay said payee $13,500. The payment was cancelled before it occurred and no actual dollar harm resulted. (a5) |
| 8. E*trade* | 0.00 | 4,400.00 | Attempted dollar harm occurred when an account opened under Simbaqueba's name had two checks deposited. One check was returned for NSF and the other was identified as an unauthorized ACH from an account takeover. The deposit was refunded to the account that was taken over. (a6). No actual dollar harm occurred. |
| 9. E*Trade 60315124/Wells Fargo/Account 0503730608/Wachovia* | 6,553.63 | 18,466.37 | Actual and attempted dollar harm occurred when an E*Trade account opened under Simbaqueba's name had an unauthorized ACH deposit of $25,000 from a Wells Fargo Account. Before the unauthorized deposit was identified, the Ameritrade account transferred $340 to a Wachovia account and liquidated $6,213.63 of shares. E*Trade returned the $25,000 to Wells Fargo, and was left with an actual dollar harm of $6,553.63. The remaining $18,446.37 was attempted dollar harm. (A7) |
| 10. E*Trade and 57352922 | 149,090.00 | 0.00 | Actual dollar harm occurred when an E*Trade account was subject to an account takeover, which made several unauthorized ACH transfers and wire transfers. (a14) The ACH transfers and wire transfers were traced mainly to two accounts - Tiger Direct and Global Enterprise Tech. Both of these companies provided documentation that Simbaqueba (Ganoa) made purchases to these companies. |
| 11. E*Trade 60315124 | 6,724.15 | 18,275.85 | Actual and attempted dollar harm occurred when there was an unauthorized ACH deposit of $25,000 to an E*Trade account opened under Simbaqueba's name. E*Trade incurred actual dollar harm for shares sold before the unauthorized deposit was identified. E*Trade returned the entire $25,000 to the account holder, so the remaining balance resulted in no dollar harm. (a21) |
| 12. E*Trade 61620775/Metabank | 0.00 | 24,000.00 | Attempted dollar harm occurred when a fraudulent deposit was made on an E*Trade account in Simbaqueba's name. The funds were returned to the account and no actual dollar harm occurred.(a21) |



3 of 10

15-000 Review
B.S.

| Bank/Victim | Actual Dollar Harm | Failed Attempt Dollar Harm | Description of Incident of Dollar Harm |
|---|---|---|---|
| 13.) E*TRADE 60248238 and Regions Bank 657950606 and Habersham | 9,798.80 | 15,000.00 | Actual and attempted dollar harm occurred when two unauthorized ACH deposits were made into an E*Trade account. One amount (15,000) was recovered and returned to the original account holder, which resulted in no dollar harm. $9,800 of the other transfer of $9,900 had already been withdrawn from E*Trade before the transfer was determined to be unauthorized. E*Trade suffered dollar harm for the withdrawal amount. (a32) and (a34). These fraudulent transactions are linked to Simbaqueba through the fact that the E*Trade account was opened under Christopher Harris's name, which was found on Simbaqueba's computer. In addition, a Charles Schwab account in Simbaqueba's name had unauthorized funds deposited from the same account (Habersham) |
| 14. CHARLES SCHWAB & CO., INC./HABERSHAM OB/GYN ASSOCIATES* | 0.00 | 15,000.00 | Attempted dollar harm occurred when a fraudulent deposit was made to an E*Trade account opened under Simbaqueba's name. The deposit was subsequently returned to the account holder and no dollar harm was incurred by E*Trade. (a8) |
| 15.) Fifth Third / FLOOR STYLE PRODUCTS | 18,798.76 | 18,644.24 | Actual and attempted dollar harm occurred when a Fifth Third account (Floor Style Products) was the victim of an account take over. The account had unauthorized transfers of $37,434 to account for Neyla Velaro and Simbaqueba. Fifth Third was able to recover $18,644.24 from the Velaro and Simbaqueba accounts, which therefore resulted in no actual dollar harm. The remaining transfers were actual dollar harm that was split between Fifth Third and the account holder. (a9) and (a29) |
| 16. WMBFA (WAMU)/ BOA / #3763886759* | 3,250.00 | 3,150.00 | Actual and attempted loss occurred when unauthorized deposits were made into a WMBFA account in Simbaqueba's (Bonilla) name. Before the unauthorized deposits were made, a withdrawal was made. WMBFA returned the total unauthorized deposits, and was left with an actual dollar harm of the withdrawal amount. The remaining amount resulted in no dollar harm. (a10) |
| 17. Citibank Debit Card | 100.00 | 39,400.00 | The actual and attempt dollar harm occurred when there were unauthorized transfers of funds for 5 Citibank debit card accounts. The IP addresses of the transfers were from Columbia and Simbaqueba had the account holders' names in his possession. Citibank was able to collect all but $100 of the unauthorized transfers, so for the majority of the unauthorized transfers, there was no actual dollar harm. (a26) |
| 18. DFAS Account holders | 19,573.86 | 12,754.64 | Actual and attempted dollar harm occurred when funds were diverted from the Military Pay system for several employees into other bank accounts. Some funds were able to be recovered from the other banks, so there was no dollar harm for those incidents. (a35). The DFAS employee names were found on Simbaqueba's computer. (a38) |

#13

#14



| Bank/Victim | Actual Dollar Harm | Failed Attempt Dollar Harm | Description of Incident of Dollar Harm |
|---|---|---|---|
| 19. Discover Card | 12,214.03 | 0.00 | Actual dollar harm occurred through account take overs of 10 Discover card accounts (for three individuals.) Simbaqueba is identified by purchases made through American Airlines for himself or known associates. Discover was able to recover all amounts (except $1.50) from vendors, so the vendors suffered the actual dollar harm. (A13) Amounts related to American Airlines were removed because they are listed elsewhere in this spreadsheet. Amounts related to SpectorSoft were also removed. Two transactions totaling $50.22 were removed from the actual dollar harm because Discover card indicated that the card was swiped. There is no evidence that Simbaqueba had access to a card to swipe. |
| 20. American Airlines (Simba associates) | 14,995.70 | 1161.7 | Actual and attempted dollar harm occurred when Simbaqueba's known associates used fraudulent credit cards to purchase or attempt to purchase airline tickets. The actual dollar harm for American Airlines was the amount that American Airlines reimbursed the credit card companies. ($1,337.60 was paid to Discover). The $1,161.70 was the value of the tickets attempted to be purchased for those individuals, but was rejected by American Airlines. No actual dollar harm is associated with those values. (a15) |
| 21. American Airlines (Simba Only) | 14,635.00 | 1,998.70 | Actual and attempted dollar harm occurred when Simbaqueba used fraudulent credit cards to purchase or attempt to purchase airline tickets. The actual dollar harm for American Airlines was the amount that American Airlines reimbursed the credit card companies. ($5,035.30 was paid to Discover). The $1,998.70 was the value of the tickets attempted to be purchased for those individuals, but was rejected by American Airlines. No actual dollar harm is associated with those values. (a15) |
| 22. Harris Direct LLC (now E*trade)/ David Tente and Diane Jtten* | 4,086.81 | 12,520.00 | The actual and attempted dollar harm occurred when 4 unauthorized requests for wire transfers totaling $16,520 were sent to a Harris Direct account. Harris Direct was either able to recover or did not send $12,520 of the requested amount, and therefore, no actual dollar harm is associated with that amount. Harris Direct was unable to recover the remaining $4,000 transfer and also incurred a loss of 86.81 related to the $4,000, which resulted in actual dollar harm to Harris Direct. (a11) |

| Bank/Victim | Actual Dollar Harm | Failed Attempted Dollar Harm | Description of Incident of Dollar Harm |
|---|---|---|---|
| 23. La Salle Bank, ID 326341094; Case 07-1713/ JCPenny/Sarah Cote/Bryan Mitchell/Larry Fleisher and associates ltd | 0.00 | 4,588.00 | The attempted dollar harm occurred when there were unauthorized payments on a LaSalle account. Per SA James Olmstead, when he provided La Salle bank a user name and password found in Simbaqueba's possession, LaSalle identified Larry Fleisher and Associates as the account holder and that fraud had occurred on the account. They provided account transaction information and highlighted 5 transactions that were fraudulent. These amounts were returned to the account holder and therefore, there was no actual dollar harm. (a22) |
| 24. E*Trade/Charles Schwab and Co 6130-6498/estate* | 0.00 | 150,000.00 | The attempted dollar harm occurred when there was an unauthorized transfer of a Charles Schwab account to an E*Trade account. An individual went into the Schwab account and changed the address to one in Phoenix traced to Simbaqueba. Charles Schwab identified this as an unauthorized transaction and stopped the transfer. There was no actual dollar harm. (a17) |
| 25. Fidelity * | 3,500.00 | 16,500.00 | Actual and attempted dollar harm occurred when a Fidelity account opened in Simbaqueba's name had unauthorized deposits totaling $19,900. An actual dollar harm to Fidelity of $3,500 occurred when debit charges were made against that account before the unauthorized deposits were identified. The remaining $16,500 was returned and no actual dollar harm occurred. (a23) |
| 26. Fidelity 2B/119610* | 0.00 | 86,382.00 | The attempted dollar harm occurred when a Fidelity account take-over sent funds to a Pakmail address in IL. This Pakmail was opened under Simbaqueba's name. (a27) Fidelity was able to issue a stop check distribution on these amounts and no actual dollar harm was incurred. (a24) |
| 27. Fidelity X45655212* | 0.00 | 40,000.00 | The attempted dollar harm occurred when a Fidelity account had an unauthorized bill payment to Simbaqueba. Fidelity identified the fraud and was able to stop funds and therefore, there was no dollar harm. (a24) |
| 28. Wachovia 1010025482443* | 0.00 | 60,000.00 | The attempted dollar harm occurred when a Wachovia account was taken-over and funds were transferred to other accounts. The account holders notified Wachovia in time for the funds to be pulled back. Therefore there was no actual dollar value. The unauthorized access was linked to Simbaqueba because he had the account holders login and password in his possession. (A18) |

#.24

#29

| Bank/Victim | Actual Dollar Harm | Failed Attempt Dollar Harm | Description of Incident of Dollar Harm |
|---|---|---|---|
| 29. Sun Trust 1000023834483 | 2,664.56 | 2,265.44 | The actual and attempted dollar harm occurred when a Sun Trust account opened in Simbaqueba's name had two fraudulently obtained checks deposited into the account totaling $4,930. Before those funds were identified as unauthorized, $2,664.56 was withdrawn on the account. When Sun Trust returned the fraudulently deposited funds, they incurred actual dollar harm for the withdrawal. The remaining amount was recovered and incurred no dollar harm. (a16) |
| 30. Educators Credit Union | $2,501.43 | 0.00 | Actual dollar harm occurred through an unauthorized transfer funds to an account with Neyla Valero as an authorized account user. The account was originally identified as potential fraud because the user name and id were found on Simbaqueba's possession. (a31) |
| 31. Bank of America | $2,261.86 | 0.00 | Actual dollar harm occurred when a bank of America credit card was used for fraudulent purchases. Simbaqueba was linked to the fraud because Hotwire provided documentation that Simbaqueba was the individual staying in the hotel that he fraudulently purchased with the credit card.(a28)  Bank of America was able to recover $1,731.97 from the vendors (American Airlines and Vonage)  Therefore, American Airlines and Vonage suffered the actual dollar harm. The American Airlines amount is not included in the support that American Airlines provided as their dollar harm, so it is included in this amount.  Vonage is not listed separately in this analysis, so there is no duplication.  The remaining credit card transactions were not recovered by Bank of America and therefore Bank of America incurred those actual dollar harm. (a19). |
| 32. SpectorSoft | 238.80 | 0.00 | Actual dollar harm occurred when SpectorSoft had to return funds to the credit card companies for fraudulent purchases by Simbaqueba.  SpectorSoft provided documentation that stated that they incurred $600 of loss related to charges considered invalid and charged back by the credit card companies.  There was $139.90 in the Discover transactions for SpectorSoft that were charged back.  There was a $99.90 transaction in the Chase support for the fraud transactions.  Because we did not get the support for whether that $99.90 was recovered from Chase, we do not know if this is a duplicate amount.  To ensure that no duplication of loss is calculated, the $99.90 was removed from the Chase credit card.  SpectorSoft did not keep the details of the credit cards and Citibank did not provide us detailed transactions for their chargebacks, so this entire amount could be duplicate.  Therefore, only the $99.90 and #139.90 removed from the Chase Credit Card and Discover dollar harm is reported as dollar harm for SpectorSoft to ensure there is no duplication of dollar harm. (a33) |

| Bank/Victim | Actual Dollar Harm | Failed Attempted Dollar Harm | Description of Incident of Dollar Harm |
|---|---|---|---|
| 33. GoToMyPC | 269.40 | 0.00 | The actual dollar harm of $269.40 occurred when Simbaqueba purchased an item from GoToMyPC on a fraudulently opened Chase Credit card, which Chase subsequently charged back to GoToMyPC. NOTE: GoToMyPC also provided $102.04 as dollar harm. However, they could not provide detailed enough records to ensure that these amounts are not included in other losses on this spreadsheet. Therefore, to ensure there is no duplicate dollar harm values calculated, they are not included. (A25) |
| 34. Hotwire | 2,337.25 | 976.07 | The actual dollar harm occurred when Hotwire was charge backed funds from the credit cards for fraudulent purchases. Documentation showed that the charges purchased from Hotwire were in Simbaqueba's name. Documentation showed which credit card and number were charged back. There is no duplication in the charges for Chase, Discover or Bank of America. The attempted dollar harm occurred when reservations were made, but Hotwire identified the fraudulent transactions and cancelled the transaction before harm was incurred. (a39) |
| 35. Juniper (Barclay) | 25,785.27 | 0.00 | Actual dollar harm occurred when there were four credit cards opened with authorized user as Simbaqueba. Juniper provided the summary dollar values but no longer had the detailed transactions to be able to identify what transactions were able to charge backed to the vendors. (a 40 and a41) |
| 36. Alliance Data (World Financial Network National Bank) | 1,413.16 | 0.00 | Actual dollar harm occurred when three credit cards were opened and charges were made. These three credit cards had Simbaqueba's pak mail address listed as the address. |
| 37. American Express | 10,762.51 | 0.00 | Actual dollar harm occurred when credit cards were opened using false information. All the accounts (many with Simbaqueba's name as a card holder) were created from the same IP address. American Express was able to recover some funds from vendors. However, they were unable to identify which vendors. Therefore, the entire dollar harm will be linked to American Express. (a44) and (a45)* |
| 38. Citigroup Credit Card | 25,372.98 | | Actual Dollar harm occurred when fraudulent purchases were made on several credit cards. The fraudulent purchases are linked to Simbaqueba through credit card receipts. A deduction of $464.35 was made from the total Citigroup amounts because these amounts are charge backs that are already included in the Hotwire amount. (a46, a47 a48 and a49) |
| Total | $437,810.42 | $789,982.77 | |

\* These transactions were supported by documentation expected to be under protective order.

# Exhibit "G"

**ACH Debits**

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/26/2006 3:00 | J4-OUT | 0 | ACH WITHDRAWAL REFID:9836652038; | $0.00 | Transfer | ($2,250.00) |
| 7/26/2006 3:00 | J4-OUT | 0 | ACH WITHDRAWAL REFID:9836628038; | $0.00 | Transfer | ($2,200.00) |
| 7/26/2006 3:00 | J4-OUT | 0 | ACH WITHDRAWAL REFID:9836621038; | $0.00 | Transfer | ($2,400.00) |
| | | | | | | ($6,850.00) |

**Wire Out Debits**

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/28/2006 3:00 | E5-OWR | 0 | WIRE OUT | $0.00 | Wire | ($7,000.00) |
| 7/27/2006 3:00 | E5-OWR | 0 | WIRE OUT | $0.00 | Wire | ($11,100.00) |
| 7/25/2006 3:00 | E5-IWR | 0 | INWIRE-20060725E3B75D2C002261 | $0.00 | Wire | $15,300.00 |
| 7/25/2006 3:00 | E5-OWR | 0 | WIRE OUT | $0.00 | Wire | ($15,300.00) |
| 7/21/2006 3:00 | E5-OWR | 0 | WIRE OUT | $0.00 | Wire | ($8,500.00) |
| 7/19/2006 3:00 | E5-OWR | 0 | WIRE OUT | $0.00 | Wire | ($20,640.00) |
| 7/13/2006 3:00 | E5-OWR | 0 | WIRE OUT | $0.00 | Wire | ($50,000.00) |
| 7/12/2006 3:00 | E5-OWR | 0 | WIRE OUT | $0.00 | Wire | ($142,240.00) |

Total Loss    ($149,090.00)

Investigator Paggi that the funds from the aforementioned Wire Transfer had been removed and that only $20.00 remained in the account. Upon the return of the unauthorized EFT's to Regions Bank, this brokerage account was left with a negative balance of -$9,798.80. Online research conducted on SSN: 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 revealed that this SSN has been used by a Christopher M. Harris, 103 Collegiate Ct. Apt. #8, Blacksburg, VA. 24060. Between 08/29/04, and 09/07/04, there were four (4) incoming telephone calls from a male subject who identified himself as Christopher Harris, who requested information from several different E*TRADE Customer Service Representatives. Said calls are recorded and were transferred onto an audio CD.

04-20834

# E*TRADE FINANCIAL Corp.
## Corporate Security Investigations

## REPORT OF INVESTIGATION

DATE:                                September 8, 2004

FILE NUMBER:                         #04-391 (E/Acct. Fraud)

REPORTING INVESTIGATOR:              Terry A. Paggi, CFS, CFE

INVESTIGATION TYPE:                  Wire Fraud/Identity Theft

LOCATION:                            E*TRADE Financial Corp.
                                     10951 White Rock Road
                                     Rancho Cordova, CA. 95670

NAME(S) USED:                        Harris, Christopher M.
                                     DOB: 03-21-80/SSN: 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
                                     762 South US 1 #131
                                     Vero Beach, FL. 32962

SUBJECT:                             Unknown

## Narrative

On 09/08/04, Corporate Security Investigations was notified by Sandy Thomas, E*TRADE Financial Cash Management Services regarding the recall of two (2) unauthorized Electronic Fund Transfers (EFT) from Regions Bank Account #6579506063.

On 08/22/04, E*TRADE Brokerage Account #60248238 was opened in the name of Christopher M. Harris, SSN: 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, 762 South US 1 #131, Vero Beach, FL. 32962. This brokerage account was funded with the following two (2) unauthorized EFT's:

| Date | Institution | Account# | Amount |
|------|-------------|----------|--------|
| 08/24/04 | Regions Bank | 0656579506063 | $9,900.00 |
| 09/02/04 | Regions Bank | 0656579506063 | $15,000.00 |

On 09/07/04, a $9,800.00 Wire Transfer was conducted, where upon the aforementioned funds were deposited into SunTrust Bank Account #1000023834483. On 09/13/04, Investigator Paggi spoke with Nancy Masterson, Fraud Investigator SunTrust Bank. Masterson was able to tell

Approving Manager:
Additional Instructions:                    tiger direct david oliveira

Alternate Payee:                                    No
NLOA Received:                                      No
Approving Manager:
Additional Instructions:                            empire globaltech

**7/25/2006**
Total Debit in US$:                                              $15,325.00
Amount in US$:                                                  $15,300.00
From Currency:                          USD
To Currency:                            USD
Fee:                                                            $25.00
Wire Type:                              Domestic
Routing number:                                                63000021
Bank Name:                              WACHOVIA BANK NA OF FLORIDA
Destination Bank account number:                               2.00002E+12
Name on account at Receiving Bank:      BRIAN W KANAGA
Alternate Payee:                        No
NLOA Received:                          No
Approving Manager:
Additional Instructions:                david oliviera alberto gaona


**7/27/2006**
Total Debit in US$:                                              $11,125.00
Amount in US$:                                                  $11,100.00
From Currency:                          USD
To Currency:                            USD
Fee:                                                            $25.00
Wire Type:                              Domestic
Routing number:                                                63000021
Bank Name:                              WACHOVIA BANK NA OF FLORIDA
Destination Bank account number:                               2.00002E+12
Name on account at Receiving Bank:      BRIAN W KANAGA
Alternate Payee:                        No
NLOA Received:                          No
Approving Manager:
Additional Instructions:                tiger direct david oliveira

**7/28/2006**
Total Debit in US$:                                              $7,025.00
Amount in US$:                                                  $7,000.00
From Currency:                          USD
To Currency:                            USD
Fee:                                                            $25.00
Wire Type:                              Domestic
Routing number:                                                63000021
Bank Name:                              WACHOVIA BANK NA OF FLORIDA
Destination Bank account number:                               2.00002E+12
Name on account at Receiving Bank:      BRIAN W KANAGA
Alternate Payee:                        No
NLOA Received:                          No

**7/12/2006**

| | |
|---|---|
| Total Debit in US$: | |
| Amount in US$: | $45,025.00 |
| From Currency: | $45,000.00 |
| To Currency: | USD |
| | USD |
| Fee: | |
| Wire Type: | $25.00 |
| Routing number: | Domestic |
| Bank Name: | 21000089 |
| Destination Bank account number: | CITIBANK N.A. |
| Name on account at Receiving Bank: | 79544202 |
| | BRIAN W KANAGA |

**7/13/2006**

| | |
|---|---|
| Total Debit in US$: | |
| Amount in US$: | $50,025.00 |
| From Currency: | $50,000.00 |
| To Currency: | USD |
| | USD |
| Fee: | |
| Wire Type: | $25.00 |
| Routing number: | Domestic |
| Bank Name: | 63000021 |
| Destination Bank account number: | WACHOVIA BANK NA OF FLORIDA |
| Name on account at Receiving Bank: | 2.00002E+12 |
| | BRIAN W KANAGA |

**7/19/2006**

| | |
|---|---|
| Total Debit in US$: | |
| Amount in US$: | $20,665.00 |
| From Currency: | $20,640.00 |
| To Currency: | USD |
| | USD |
| Fee: | |
| Wire Type: | $25.00 |
| Routing number: | Domestic |
| Bank Name: | 63000021 |
| Destination Bank account number: | WACHOVIA BANK NA OF FLORIDA |
| Name on account at Receiving Bank: | 2.00002E+12 |
| Alternate Payee: | BRIAN W KANAGA |
| NLOA Received: | No |
| Approving Manager: | No |
| Additional Instructions: | |
| | tiger direct david oliviera |

**7/21/2006**

| | |
|---|---|
| Total Debit in US$: | |
| Amount in US$: | $8,525.00 |
| From Currency: | $8,500.00 |
| To Currency: | USD |
| | USD |
| Fee: | |
| Wire Type: | $25.00 |
| Routing number: | Domestic |
| Bank Name: | 21000089 |
| Destination Bank account number: | CITIBANK N.A. |
| Name on account at Receiving Bank: | 79544202 |
| | BRIAN W KANAGA |

Alternate Payee:                        No
NLOA Received:                          No
Approving Manager:
Additional Instructions:                empire globaltech

**7/25/2006**
Total Debit in US$:                              $15,325.00
Amount in US$:                                   $15,300.00
From Currency:                          USD
To Currency:                            USD
Fee:                                             $25.00
Wire Type:                              Domestic
Routing number:                                  63000021
Bank Name:                              WACHOVIA BANK NA OF FLORIDA
Destination Bank account number:                 2.00002E+12
Name on account at Receiving Bank:      BRIAN W KANAGA
Alternate Payee:                        No
NLOA Received:                          No
Approving Manager:
Additional Instructions:                david oliviera alberto gaona


**7/27/2006**
Total Debit in US$:                              $11,125.00
Amount in US$:                                   $11,100.00
From Currency:                          USD
To Currency:                            USD
Fee:                                             $25.00
Wire Type:                              Domestic
Routing number:                                  63000021
Bank Name:                              WACHOVIA BANK NA OF FLORIDA
Destination Bank account number:                 2.00002E+12
Name on account at Receiving Bank:      BRIAN W KANAGA
Alternate Payee:                        No
NLOA Received:                          No
Approving Manager:
Additional Instructions:                tiger direct david oliveira

**7/28/2006**
Total Debit in US$:                              $7,025.00
Amount in US$:                                   $7,000.00
From Currency:                          USD
To Currency:                            USD
Fee:                                             $25.00
Wire Type:                              Domestic
Routing number:                                  63000021
Bank Name:                              WACHOVIA BANK NA OF FLORIDA
Destination Bank account number:                 2.00002E+12
Name on account at Receiving Bank:      BRIAN W KANAGA
Alternate Payee:                        No
NLOA Received:                          No



**7/12/2006**
| | |
|---|---|
| Total Debit in US$: | $45,025.00 |
| Amount in US$: | $45,000.00 |
| From Currency: | USD |
| To Currency: | USD |
| Fee: | $25.00 |
| Wire Type: | Domestic |
| Routing number: | 21000089 |
| Bank Name: | CITIBANK N.A. |
| Destination Bank account number: | 79544202 |
| Name on account at Receiving Bank: | BRIAN W KANAGA |

**7/13/2006**
| | |
|---|---|
| Total Debit in US$: | $50,025.00 |
| Amount in US$: | $50,000.00 |
| From Currency: | USD |
| To Currency: | USD |
| Fee: | $25.00 |
| Wire Type: | Domestic |
| Routing number: | 63000021 |
| Bank Name: | WACHOVIA BANK NA OF FLORIDA |
| Destination Bank account number: | 2.00002E+12 |
| Name on account at Receiving Bank: | BRIAN W KANAGA |

**7/19/2006**
| | |
|---|---|
| Total Debit in US$: | $20,665.00 |
| Amount in US$: | $20,640.00 |
| From Currency: | USD |
| To Currency: | USD |
| Fee: | $25.00 |
| Wire Type: | Domestic |
| Routing number: | 63000021 |
| Bank Name: | WACHOVIA BANK NA OF FLORIDA |
| Destination Bank account number: | 2.00002E+12 |
| Name on account at Receiving Bank: | BRIAN W KANAGA |
| Alternate Payee: | No |
| NLOA Received: | No |
| Approving Manager: | |
| Additional Instructions: | tiger direct david oliviera |

**7/21/2006**
| | |
|---|---|
| Total Debit in US$: | $8,525.00 |
| Amount in US$: | $8,500.00 |
| From Currency: | USD |
| To Currency: | USD |
| Fee: | $25.00 |
| Wire Type: | Domestic |
| Routing number: | 21000089 |
| Bank Name: | CITIBANK N.A. |
| Destination Bank account number: | 79544202 |
| Name on account at Receiving Bank: | BRIAN W KANAGA |



**7/12/2006**

| | | |
|---|---|---|
| Total Debit in US$: | | $45,025.00 |
| Amount in US$: | | $45,000.00 |
| From Currency: | USD | |
| To Currency: | USD | |
| Fee: | | $25.00 |
| Wire Type: | Domestic | |
| Routing number: | | 21000089 |
| Bank Name: | CITIBANK N.A. | |
| Destination Bank account number: | | 79544202 |
| Name on account at Receiving Bank: | BRIAN W KANAGA | |

**7/13/2006**

| | | |
|---|---|---|
| Total Debit in US$: | | $50,025.00 |
| Amount in US$: | | $50,000.00 |
| From Currency: | USD | |
| To Currency: | USD | |
| Fee: | | $25.00 |
| Wire Type: | Domestic | |
| Routing number: | | 63000021 |
| Bank Name: | WACHOVIA BANK NA OF FLORIDA | |
| Destination Bank account number: | | 2.00002E+12 |
| Name on account at Receiving Bank: | BRIAN W KANAGA | |

**7/19/2006**

| | | |
|---|---|---|
| Total Debit in US$: | | $20,665.00 |
| Amount in US$: | | $20,640.00 |
| From Currency: | USD | |
| To Currency: | USD | |
| Fee: | | $25.00 |
| Wire Type: | Domestic | |
| Routing number: | | 63000021 |
| Bank Name: | WACHOVIA BANK NA OF FLORIDA | |
| Destination Bank account number: | | 2.00002E+12 |
| Name on account at Receiving Bank: | BRIAN W KANAGA | |
| Alternate Payee: | No | |
| NLOA Received: | No | |
| Approving Manager: | | |
| Additional Instructions: | tiger direct david oliviera | |

**7/21/2006**

| | | |
|---|---|---|
| Total Debit in US$: | | $8,525.00 |
| Amount in US$: | | $8,500.00 |
| From Currency: | USD | |
| To Currency: | USD | |
| Fee: | | $25.00 |
| Wire Type: | Domestic | |
| Routing number: | | 21000089 |
| Bank Name: | CITIBANK N.A. | |
| Destination Bank account number: | | 79544202 |
| Name on account at Receiving Bank: | BRIAN W KANAGA | |



| | |
|---|---|
| Alternate Payee: | No |
| NLOA Received: | No |
| Approving Manager: | |
| Additional Instructions: | empire globaltech |

**7/25/2006**

| | |
|---|---|
| Total Debit in US$: | $15,325.00 |
| Amount in US$: | $15,300.00 |
| From Currency: | USD |
| To Currency: | USD |
| Fee: | $25.00 |
| Wire Type: | Domestic |
| Routing number: | 63000021 |
| Bank Name: | WACHOVIA BANK NA OF FLORIDA |
| Destination Bank account number: | 2.00002E+12 |
| Name on account at Receiving Bank: | BRIAN W KANAGA |
| Alternate Payee: | No |
| NLOA Received: | No |
| Approving Manager: | |
| Additional Instructions: | david oliviera alberto gaona |

**7/27/2006**

| | |
|---|---|
| Total Debit in US$: | $11,125.00 |
| Amount in US$: | $11,100.00 |
| From Currency: | USD |
| To Currency: | USD |
| Fee: | $25.00 |
| Wire Type: | Domestic |
| Routing number: | 63000021 |
| Bank Name: | WACHOVIA BANK NA OF FLORIDA |
| Destination Bank account number: | 2.00002E+12 |
| Name on account at Receiving Bank: | BRIAN W KANAGA |
| Alternate Payee: | No |
| NLOA Received: | No |
| Approving Manager: | |
| Additional Instructions: | tiger direct david oliveira |

**7/28/2006**

| | |
|---|---|
| Total Debit in US$: | $7,025.00 |
| Amount in US$: | $7,000.00 |
| From Currency: | USD |
| To Currency: | USD |
| Fee: | $25.00 |
| Wire Type: | Domestic |
| Routing number: | 63000021 |
| Bank Name: | WACHOVIA BANK NA OF FLORIDA |
| Destination Bank account number: | 2.00002E+12 |
| Name on account at Receiving Bank: | BRIAN W KANAGA |
| Alternate Payee: | No |
| NLOA Received: | No |

Login: MARIO1823

**Account**
61620775
Opened 6-16-2007
SSN 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
H: (305)716-9108

**Type**
INDIVIDUAL

**Name**
MARIO SIMBAQUEBA

**Address**
MARIO SIMBAQUEBA
1900 N.W. 97TH AVENUE
SUITE # 722-50674
MIAMI FL 33172-2310

**Status**
Restricted - Risk

Login: TEESMAN2

**Account**
66887869
Opened 1-11-2002
SSN 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
H: (305)716-9108

**Type**
INDIVIDUAL

**Name**
MARIO ALBERTO SIMBAQUEBA

**Address**
MARIO ALBERTO SIMBAQUEBA
2053 NW 79 AVE
SJO 9327
MIAMI FL 33122-1614

**Status**
Restricted - Risk

Login: SIMBA1823

**Account**
60315124
Opened 10-29-2004
SSN 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
H: (919)633-0920
W: (919)633-0920

**Type**
INDIVIDUAL

**Name**
MARIO SIMBAQUEBABONILLA

**Address**
MARIO SIMBAQUEBABONILLA
1812 MARSH RD
STE 6 148
WILMINGTON DE 19810-4581

**Status**
Closed

# E✳TRADE
**FINANCIAL**

October 8, 2007

SA James Olmstead
Defense Criminal Investigative Service
4449 Easton Way, Suite 375
Columbus, OH 43219

Agent Olmstead,

In regards to Mario Simba aka, Mario Simbaqueba, aka, Mario Albert Simbaqueba
Bonilla, I have enclosed all documents available.

Please find for account 61620775 a copy of the check deposit made 06-19-2007 that was
returned by the payee bank.

Please find for account 60315124 notes and a partial account history. Though not
included in the account history the notes indicate that customer had an ACH deposit that
was returned after a purchase of 3,400 shares of GOAM were purchased. It appears we
took a loss of $6,724.15 on the buy of these shares due to the return ACH item.

There are no records of activity or interaction for account 66887869 as the account was
never funded. All the accounts have been closed.

As for the Harris Direct account related to SAR 20053420008018 E*TRADE Financial
does not have documents on file in regards to this activity, however as we purchased
them, we assumed all their liability. Any loss they would have reported in 2005 would
have been written off, but as we assumed this liability, we would also assume any due
restitution.

If I can be of further assistance please do not hesitate to contact me.

Sincerely,

Erik Gamlem
Corporate Investigator
E*TRADE Financial

0306-ETFLTHD-PS0551

***FACSIMILE***                                            20053420008018

| Part VI | Suspicious Activity Information - Narrative | 3 |

S.A. DYNAMIC IP BLOCK (DHCP) ADDRESS-CARRERA 11A NO. 94-76,0,0-BOGOTA-DC. BANCO DAVIVIENDA S.A. IS LISTED AS COLOMBIA S THIRD LARGEST BANK AND IS LOCATED IN BOGOTA COLOMBIA. THIS REPORT IS FILED IN CONJUNCTION WITH PERSHING LLC, THE CLEARING FIRM FOR HARRISDIRECT LLC, AND E TRADE FINANCIAL CORPORATION, TH4 NEW OWNER OF HARRISDIRECT LLC. HARRISDIRECT HAS REALIZED LOSSES IN THE AMOUNT OF $4086.81.

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Part 103. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose related to a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Secretary of the Treasury or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Such reports, or the fact they have been filed, may not be disclosed by a government employee to any person involved in the transaction, "other than as necessary to fulfill the official duties of such officer or employee." 31 U.S.C. 5318 (g)(2)(ii). Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

***FACSIMILE***                                    20053420008018

| Part VI | Suspicious Activity Information - Narrative | 3 |

ON NOVEMBER 7, 2005, HARRISDIRECT LLC RECEIVED A FAXED REQUEST TO WIRE FUNDS FROM A CLIENT S ACCOUNT AS FOLLOWS: ABA 026005092-WACHOVIA BANK-NEW YORK, NY-A/C OF DAVID TENTE, DIANE TENTE,-A/C 006301063225-$4000 WITH ADDITIONAL INFORMATION AS FOLLOWS: FCO DAVIVIENDA-SWIFT CAVDCOBB-ACC #006301063225. DURING THE PROCESSING OF THE WIRE REQUEST, THE ADDITIONAL INFORMATION HAD BEEN INADVERTENTLY DISREGARDED AND THE WIRE REQUEST FOR $4000 HAD ONLY BEEN SENT TO THE INITIAL INSTRUCTIONS TO WACHOVIA BANK AT THE ACCOUNT NUMBER ABOVE. ON NOVEMBER 9, 2005, HARRISDIRECT LLC RECEIVED A 2ND FAXED REQUEST TO WIRE FUNDS FROM A CLIENT S ACCOUNT AS FOLLOWS: ABA 021000089-CITIBANK-NEW YORK, NY-A/C OF DAVID TENTE, DIANE TENTE-A/C 006301063225-$4520 WITH ADDITIONAL INFORMATION: FCO BANCO DAVIVIENDA-SWIFT CAVDCOBB-MARIO SIMBAQUEBA-ACCT # 006301063225. THIS WIRE WAS ALSO ONLY SENT TO THE INITIAL PROCESSING BANK. THE PROCESSOR FAILED TO RECOGNIZE THE ADDITIONAL INSTRUCTIONS FOR FURTHER CREDIT. AS A RESULT OF THE INITIAL WIRE REQUEST ON 11/7/05 ONLY BEING SENT TO THE FIRST PORTION OF THE INSTRUCTIONS, THE FUNDS WERE RECEIVED BACK BY HARRISDIRECT AS THE RECEIVING BANK, WACHOVIA, WAS UNABLE TO APPLY THE WIRE. THE SECOND WIRE PROCESSED FROM THE ACCOUNT ON 11/9/05 WAS ALSO RETURNED BY CITIBANK ON 11/10/05, AS THEY WERE UNABLE TO APPLY THE FUNDS. ON NOVEMBER 10, 2005 A 3RD FAXED WIRE REQUEST WAS RECEIVED TO WIRE FUNDS FROM THE CLIENT S ACCOUNT AS FOLLOWS: ABA 026005092-WACHOVIA BANK-NEW YORK, NY-A/C OF DAVID TENTE, DIANE TENTE-A/C 200192002710-$4000 WITH ADDITIONAL INFORMATION AS FOLLOWS: FCO BANCO DAVIVIENDA-SWIFT CAVDCOBB-MARIO SIMBA-ACCT# 006301063225. THE WIRE REQUEST WAS PROCESSED SENDING THE FUNDS ONLY TO WACHOVIA BANK, WITHOUT THE ADDITIONAL INSTRUCTIONS FOR BANCO DAVIVIENDA. ALTHOUGH THE ADDITIONAL INFORMATION FOR FURTHER CREDIT TO BANCO DAVIVIENDA WAS NOT TRANSMITTED TO WACHOVIA BANK, THEY HAVE APPLIED THE WIRE FOR $4000 TO A CUSTOMER ACCOUNT WITH THAT INSTITUTION. WE HAVE ATTEMPTED TO RECLAIM THE FUNDS HOWEVER WACHOVIA BANK HAS NOT COMPLIED WITH THE REQUEST, AND WILL NOT PROVIDE ANY ADDITIONAL INFORMATION. ON NOVEMBER 10, 2005 A 4TH REQUEST TO WIRE FUNDS WAS RECEIVED BY FAX. THE INSTRUCTIONS TO WIRE AS FOLLOWS: ABA 026005092-WACHOVIA BANK-NEW YORK, NY-A/C OF DAVID TENTE, DIANE TENTE-A/C 200192002710-$4000 WITH ADDITIONAL INFORMATION TO FCO BANCO DAVIVIENDA SWIFT CAVDCOBB-A/C OF MARIO SIMBA-ACC #006301063225. THIS REQUEST WAS NOT PROCESSED AS THE REVIEWER RECOGNIZED THAT A PREVIOUS REQUEST HAD ALREADY BEEN SENT THAT SAME DAY. OUR CLIENT S ACCOUNT IS REGISTERED TO DAVID TENTE AND DIANE JTTEN. PURSUANT TO A WRITTEN REQUEST BY MR. TENTE, WE BEGAN AN INVESTIGATION INTO THE PROCESSING OF THE WIRE REQUESTS. MR. & MRS. TENTE DID NOT REQUEST THE WIRED FUNDS FROM THEIR ACCOUNT WITH HARRISDIRECT. WE RETRIEVED THE IP ADDRESS LOGS FROM THE TENTE ACCOUNT TO DETERMINE IF THE PERPETRATOR ACTUALLY LOGGED INTO THE TENTE ACCOUNT USING THEIR UNIQUE USERID AND PASSWORD. WE HAVE CONFIRMED THAT THE PERPETRATOR DID IN FACT LOG INTO THE TENTE ACCOUNT. THE IP ADDRESS RETAINED DURING THESE SESSIONS IS 200.118.33.241. OUR LOGS SHOW AT A MINIMUM THAT THE PERPETRATOR ACCESSED OUR CUSTOMER S ACCOUNT BEGINNING 11/7/05 ON AT LEAST 43 TIMES UNTIL ACCESS WAS BLOCKED ON 11/11/05. RESEARCH ON THE IP ADDRESS LOGGING INTO OUR CLIENTS ACCOUNT REVEALS THE FOLLOWING: TV CABLE

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq., 31 CFR Part 103. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose related to a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Secretary of the Treasury or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Such reports, or the fact they have been filed, may not be disclosed by a government employee to any person involved in the transaction, "other than as necessary to fulfill the official duties of such officer or employee." 31 U.S.C. 5318 (g)(2)(ii). Unauthorized release of information collected under the BSA may result in criminal or civil sanctions

***FACSIMILE***                                           20053420008018

## Part III   Law Enforcement or Regulatory Contact Information                    2

31 If a law enforcement or regulatory authority has been contacted (excluding submission of a SAR) check the appropriate box.

- a ☐ DEA
- b ☐ U.S. Attorney(**32)
- c ☐ IRS
- d ☐ FBI
- e ☐ ICE

- f ☐ Secret Service
- g ☐ CFTC
- h ☐ SEC
- i ☐ NASD
- j ☐ NFA

- k ☐ NYSE
- l ☐ Other RFA
- m ☐ Other RE-futures(CME,CBOT,NYMEX,NYBOT)
- n ☐ Other state/local
- o ☐ Other SRO-securities (PHLX,PCX,CBOE,AMEX,etc.)

- p ☐ State securities regulator
- q ☐ Foreign
- r ☐ Other (Explain in Part VI)

32 Other authority contacted (for item 31 l through r) ** List U.S. Attorney office here.

33 Name of individual contacted (for all of item 31)

34 Telephone number of individual contacted (Item 33)

35 Date contacted

## Part IV   Reporting Financial Institution Information

*36 Name of financial institution or sole proprietorship
HARRISDIRECT LLC

*37 EIN/SSN/ITIN
133902248

*38 Address
HARBORSIDE FINANCIAL CENTER-50

*39 City
JERSEY CITY

*40 State
NJ

*41 ZIP code
07311

42 Additional branch address locations handling account, activity or customer.
4235 SOUTH STREAM BLVD

43 ☒ Multiple locations

44 City
CHARLOTTE

45 State
NC

46 ZIP code
28217

47 Central Registration Depository number
42159

48 SEC ID number

49 NFA ID number

50 Has this reporting individual/entity coordinated this report with another reporting individual/entity? Yes ☒ (Provide details in Part VI)   No ☐

51 Type of institution or individual- Check box(es) for functions that apply to this report

- a ☐ Agricultural trade option merchant
- b ☐ Affiliate of bank holding company
- c ☐ CPO
- d ☐ CTA
- e ☐ Direct participation program
- f ☐ FCM
- g ☐ Futures floor broker
- h ☐ Futures floor trader
- i ☐ IB-C

- j ☐ IA
- k ☐ Investment company - mutual fund
- l ☐ Market maker
- m ☐ Municipal securities dealer
- n ☐ NFA
- o ☐ RE-futures
- p ☐ Other RFA
- q ☐ Securities broker - clearing
- r ☒ Securities broker - introducing

- s ☐ Securities dealer
- t ☐ Securities floor broker
- u ☐ Securities options broker-dealer
- v ☐ SRO-securities
- w ☐ Specialist
- x ☐ Subsidiary of bank
- y ☐ U.S. Government broker-dealer
- z ☐ U.S. Government interdealer broker
- aa ☐ Other (Describe in Part VI)

## Part V   Contact For Assistance

*52 Last name of individual to be contacted regarding this report
YOUNG

*53 First name
LYNN

*54 Middle initial
M

*55 Title/Position
DIRECTOR/AML COMPLIANCE OFFICER

*56 Work phone number
(201) 308-2226

*57 Date report prepared
11/28/2005

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Part 103. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose related to a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Secretary of the Treasury or his authorized delegate. Suspicious activity reports filed under the BSA may not be disclosed by a person involved in the transaction, "other than as necessary to fulfill the official duties of such officer or employee." 31 U.S.C. 5318 (g)(2)(ii). Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

gov(22)

***FACSIMILE***                                    2005342008018

| FinCEN Form 101 | Suspicious Activity Report by the Securities and Futures Industries | |
|---|---|---|
| Effective May 2004 | Please type or print. Always complete entire report. Items Marked with an asterisk * are considered critical. | OMB No. 1506 - 0019 |

1  Check the box if this report corrects a prior report ☐

## Part I    Subject Information

2 Check box a ☐  if multiple subjects    box b ☐  subject information unavailable

| *3  Individual's last name or entity's full name | | *4  First Name | 5  Middle initial |
|---|---|---|---|
| SIMBA | | MARIO | |

| 6  Also known as (AKA - Individual), Doing business as (DBA - entity) | 7  Occupation or type of business |
|---|---|
| MARIO SIMBAQUEBA | UNKNOWN |

| *8  Address | | *9  City |
|---|---|---|
| UNKNOWN | | BOGOTA |

| *10 State | *11 ZIP code | *12 County Code (if not U.S.) | 13  E-mail Address (If available) |
|---|---|---|---|
| XX | | CO | JORDAN1823@YAHOO.COM |

| *14 SSN/ITIN (individual), or EIN(entity) | *15 Account number(s) affected, if any. Indicate if closed. | 16  Date of birth |
|---|---|---|
| | Acct' # 62V132392     yes ☐  Acct' #          yes ☐ | |
| | Acct' #                yes ☐  Acct' #          yes ☐ | |

17  Government issued identification (If available)
a ☐ Driver's license/state ID    b ☐ Passport    c ☐ Alien registration    d ☐ Corporate/Partnership Resolution
e ☒ Other NON-DOCUMENTARY VERIFICATION
f  ID number                                                              g  Issuing state or county (2 digit code)

| 18  Phone number - work | 19  Phone Number - home | 20  Is individual/business associated/affiliated with the reporting institution? |
|---|---|---|
| | | a ☐ Yes    b ☒ No |

## Part II    Suspicious Activity Information

| *21 Date or date range of suspicious activity | *22 Total dollar amount involved in suspicious activity |
|---|---|
| From 11/07/2005    To 11/10/2005 | 12,520 |

23  Instrument type (Check all that apply)

a ☐ Bonds/Notes
b ☐ Cash or equiv.
c ☐ Commercial paper
d ☐ Commodity futures contract
e ☐ Money Market Mutual Fund
f ☐ Mutual Fund
g ☐ OTC Derivatives
h ☐ Other derivatives

i ☐ Commodity options
j ☐ Security futures products
k ☐ Stocks
l ☐ Warrants
m ☐ Other securities
n ☐ Other non-securities
o ☐ Foreign currency futures/options
p ☐ Foreign currencies

q ☐ Commodity type

r ☐ Instrument description

s ☐ Market where traded
(Enter appropriate three or four-letter code.)
t ☒ Other (Explain in Part IV)

| 24  CUSIP® number | 25  CUSIP® number | 26  CUSIP® number |
|---|---|---|
| 27  CUSIP® number | 28  CUSIP® number | 29  CUSIP® number |

*30 Type of suspicious activity:

a ☐ Bribery/gratuity
b ☐ Check fraud
c ☐ Computer intrusion
d ☐ Credit/debit card fraud
e ☐ Embezzlement
f ☐ Commodity futures/options fraud
g ☐ Forgery

h ☐ Identity theft
i ☐ Insider trading
j ☐ Mail fraud
k ☐ Market manipulation
l ☐ Money laundering/Structuring
m ☐ Prearranged or other non-competitive trading
n ☐ Securities fraud

o ☐ Significant wire or other transactions without economic purpose
p ☐ Suspicious document or ID presented
q ☐ Terrorist financing
r ☐ Wash or other fictitious trading
s ☒ Wire fraud
t ☒ Other (Describe in Part VI)

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Part 103. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose related to a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Secretary of the Treasury or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Such reports, or the fact they have been filed, may not be disclosed by a government employee to any person involved in the transaction, "other than as necessary to fulfill the official duties of such officer or employee." 31 U.S.C. 5318 (g)(2)(ii). Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

***FACSIMILE***

20051040013418

| Part VI | Suspicious Activity Information - Narrative | 3 |

POSSIBLE IDENTITY THEFT ON 10/29/04, E*TRADE BROKERAGE ACCOUN #60315124 WAS OPENED IN THE NAME OF MARIO SIMBAQUEBABONILLA, SSN: 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, 1812 MARCH RD. SUITE #6 -148, WILMINGTON, DE. 19810. THIS BROKERAGE ACCOUNT WAS SUBSEQUENTLY FUNDED WITH AN UNAUTHORIZED $25,000.00 ACH TRANSFER WITHDRAWN FROM WELLS FARGO ACCOUNT #0503730608. UPON THE RETURN OF SAID FUNDS TO WELLS FARGO, AND AS A RESULT OF A $340.00 WIRE TRANSFER TO WACHOVIA BANK ACCOUNT #006301063225, AND AS A RESULT OF SHARES PURCHASED BY THE ACCOUNT HOLDER AND LIQUIDATED BY E*TRADE, THIS BROKERAGE ACCOUNT WAS LEFT WITH A NEGATIVE BALANCE OF $6,553.63. ONLINE RESEARCH CONDUCTED ON SSN: 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 REVEALED THAT THIS SSN HAS BEEN USED BY A MARIO SIMBAQUEBABONILLA, 1812 MARSH RD, APT. #6148, WILMINGTON, DE. 19810.

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Part 103. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose related to a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Secretary of the Treasury or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Such reports, or the fact they have been filed, may not be disclosed by a government employee to any person involved in the transaction, "other than as necessary to fulfill the official duties of such officer or employee." 31 U.S.C. 5318 (g)(2)(ii). Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

***FACSIMILE***                                                              20051040013418

| Part III | Law Enforcement or Regulatory Contact Information | 2 |

**31** If a law enforcement or regulatory authority has been contacted (excluding submission of a SAR) check the appropriate box.

a ☐ DEA                  f ☒ Secret Service       k ☐ NYSE                                    p ☐ State securities regulator
b ☐ U.S. Attorney(**32)  g ☐ CFTC                 l ☐ Other RFA                               q ☐ Foreign
c ☐ IRS                  h ☐ SEC                  m ☐ Other RE-futures(CME,CBOT,NYMEX,NYBOT)  r ☐ Other (Explain in Part VI)
d ☐ FBI                  i ☐ NASD                 n ☐ Other state/local
e ☐ ICE                  j ☐ NFA                  o ☐ Other SRO-securities (PHLX,PCX,CBOE,AMEX,etc.)

**32** Other authority contacted (for item 31 l through r) ** List U.S. Attorney office here.   | **33** Name of individual contacted (for all of item 31)
RAIC ROBERT SICA

**34** Telephone number of individual contacted (Item 33)     | **35** Date contacted
(302) 573-6188                                                | 03/18/2005

| Part IV | Reporting Financial Institution Information |

**\*36** Name of financial institution or sole proprietorship                          | **\*37** EIN/SSN/ITIN
E TRADE FINANCIAL CORPORATION                                                          | 770116489

**\*38** Address
10951 WHITE ROCK ROAD

**\*39** City                                   | **\*40** State | **\*41** ZIP code
RANCHO CORDOVA                                  | CA             | 95670

**42** Additional branch address locations handling account, activity or customer.     | **43** ☐ Multiple locations

**44** City                                     | **45** State | **46** ZIP code

**47** Central Registration Depository number   | **48** SEC ID number   | **49** NFA ID number
29106                                           | 844112

**50** Has this reporting individual/entity coordinated this report with another reporting individual/entity?  Yes ☐ (Provide details in Part VI)  No ☒

**51** Type of institution or individual- Check box(es) for functions that apply to this report

a ☐ Agricultural trade option merchant    j ☐ IA                                  s ☐ Securities dealer
b ☐ Affiliate of bank holding company     k ☐ Investment company - mutual fund     t ☐ Securities floor broker
c ☐ CPO                                    l ☒ Market maker                         u ☐ Securities options broker-dealer
d ☐ CTA                                    m ☐ Municipal securities dealer          v ☐ SRO-securities
e ☐ Direct participation program           n ☐ NFA                                  w ☐ Specialist
f ☐ FCM                                    o ☐ RE-futures                           x ☐ Subsidiary of bank
g ☐ Futures floor broker                   p ☐ Other RFA                            y ☐ U.S. Government broker-dealer
h ☐ Futures floor trader                   q ☒ Securities broker - clearing         z ☐ U.S. Government interdealer broker
i ☐ IB-C                                   r ☐ Securities broker - introducing      aa ☐ Other (Describe in Part VI)

| Part V | Contact For Assistance |

**\*52** Last name of individual to be contacted regarding this report   | **\*53** First name   | **\*54** Middle initial
PAGGI                                                                    | TERRY                 | A

**\*55** Title/Position                | **\*56** Work phone number      | **\*57** Date report prepared
CORPORATE INVESTIGATOR                 | (312) 294-7847                  | 03/17/2005

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Part 103. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose related to a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Secretary of the Treasury or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Such reports, or the fact they have been filed, may not be disclosed by a government employee to any person involved in the transaction, "other than as necessary to fulfill the official duties of such officer or employee." 31 U.S.C. 5318 (g)(2)(ii). Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

***FACSIMILE***                                                        20051040013418

| **FinCEN Form 101** | **Suspicious Activity Report by the Securities and Futures Industries** |
|---|---|
| Effective May 2004 | Please type or print. Always complete entire report. Items Marked with an asterisk * are considered critical. |

OMB No. 1506 - 0019

1   Check the box if this report corrects a prior report ☐

## Part I   Subject Information

2 Check box  a ☐  if multiple subjects      box b ☐  subject information unavailable

*3  Individual's last name or entity's full name
SIMBAQUEBABONILLA

*4  First Name
MARIO

5  Middle initial

6  Also known as (AKA - Individual), Doing business as (DBA - entity)
UNKNOWN

7  Occupation or type of business
UNKNOWN

*8  Address
1812 MARSH RD APT 6148

*9  City
WILMINGTON

*10 State
DE

*11 ZIP code
19810

*12 County Code (if not U.S.)
US

13  E-mail Address (If available)
VEROTRADING@YAHOO.COM

*14 SSN/ITIN (individual), or EIN(entity)
222882988

*15 Account number(s) affected, if any. Indicate if closed.
Acct' #60315124                yes ☒
Acct' #                        yes ☐  Acct' #                        yes ☐
Acct' #                        yes ☐

16  Date of birth
03/21/1967

17  Government issued identification (If available)
a ☐ Driver's license/state ID    b ☐ Passport    c ☐ Alien registration    d ☐ Corporate/Partnership Resolution
e ☐ Other
f  ID number                                              g  Issuing state or county (2 digit code)

18  Phone number - work

19  Phone Number - home
(919) 633-0920

20  Is individual/business associated/affiliated with the reporting institution?
a ☐ Yes    b ☒ No

## Part II   Suspicious Activity Information

*21 Date or date range of suspicious activity
From 03/07/2005      To 03/10/2005

*22 Total dollar amount involved in suspicious activity
25,000

23  Instrument type (Check all that apply)
a ☐ Bonds/Notes
b ☒ Cash or equiv.
c ☐ Commercial paper
d ☐ Commodity futures contract
e ☐ Money Market Mutual Fund
f ☐ Mutual Fund
g ☐ OTC Derivatives
h ☐ Other derivatives
i ☐ Commodity options
j ☐ Security futures products
k ☒ Stocks
l ☐ Warrents
m ☐ Other securities
n ☐ Other non-securities
o ☐ Foreign currency futures/options
p ☐ Foreign currencies
q ☐ Commodity type
r ☐ Instrument description
s ☐ Market where traded
   (Enter appropriate three or four-letter code.)
t ☐ Other (Explain in Part IV)

24  CUSIP® number
87651B104

25  CUSIP® number
38020R304

26  CUSIP® number

27  CUSIP® number

28  CUSIP® number

29  CUSIP® number

*30 Type of suspicious activity:
a ☐ Bribery/gratuity
b ☐ Check fraud
c ☐ Computer intrusion
d ☐ Credit/debit card fraud
e ☐ Embezzlement
f ☐ Commodity futures/options fraud
g ☐ Forgery
h ☒ Identity theft
i ☐ Insider trading
j ☐ Mail fraud
k ☐ Market manipulation
l ☐ Money laundering/Structuring
m ☐ Prearranged or other non-competitive trading
n ☒ Securities fraud
o ☐ Significant wire or other transactions without economic purpose
p ☐ Suspicious document or ID presented
q ☐ Terrorist financing
r ☐ Wash or other fictitious trading
s ☒ Wire fraud
t ☐ Other (Describe in Part VI)

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Part 103. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose related to a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Secretary of the Treasury or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Such reports, or the fact they have been filed, may not be disclosed by a government employee to any person involved in the transaction, "other than as necessary to fulfill the official duties of such officer or employee." 31 U.S.C. 5318 (g)(2)(ii). Unauthorized release of information collected may result in criminal or civil sanctions.

*** FACSIMILE ***                               20021760026211

| Part VII | Suspicious Activity Information Explanation/Description | 3 |

ACCOUNT #2006452375 WAS OPENED UNDER THE NAME OF MARIO A. SIMBAQUEBA ON 3/11/2002.  HIS INITIAL DEPOSIT WAS A $1,000 CHECK THAT WAS LATER RETURNED "NSF".  HE THEN DEPOSITED A $3,300 CHECK ON 4/23/2002 THAT WAS CHARGED BACK ON 4/28/2002 "ACCOUNT CLOSED".

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Part 103. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose related to a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Secretary of the Treasury or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Such reports, or the fact they have been filed, may not be disclosed by a government employee to any person involved in the transaction, "other than as necessary to fulfill the official duties of such officer or employee." 31 U.S.C. 5318 (g)(2)(ii). Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

*** FACSIMILE ***                                      20021760026211

| Part III | Suspicious Activity Information | | 2 |

**35 Date of suspicious activity**
04/26/2002

**36 Dollar amount involved in known or suspicious activity**
$ 4,400

**37 Summary characterization of suspicious activity:**

a ☐ Bank Secrecy Act/Structuring/ Money Laundering
b ☐ Bribery/Gratuity
c ☒ Check Fraud
d ☐ Check Kiting
e ☐ Commercial Loan Fraud
f ☐ Consumer Loan Fraud
r ☐ Other

g ☐ Counterfeit Check
h ☐ Counterfeit Credit/Debit Card
i ☐ Counterfeit Instrument (other)
j ☐ Credit Card Fraud
k ☒ Debit Card Fraud
l ☐ Defalcation/Embezzlement

m ☐ False Statement
n ☐ Misuse of Position or Self-Dealing
o ☐ Mortgage Loan Fraud
p ☐ Mysterious Disappearance
q ☐ Wire Transfer Fraud

**38 Amount of loss prior to recovery (if applicable)**
$ 1,415

**39 Dollar amount of recovery (if applicable)**
$

**40 Has the suspicious activity had a material impact on or otherwise affected the financial soundness of the institution?**
a ☐ Yes    b ☒ No

**41 Has the institution's bonding company been notified?**
a ☐ Yes    b ☒ No

**42 Has any law enforcement agency already been advised by telephone, written communication, or otherwise? If so, list the agency and local address.**

Agency

**43 Address**

**44 City** | **45 State** | **46 Zip Code**

| Part IV | Witness Information |

**47 Last Name** | **48 First Name** | **49 Middle Initial**

**50 Address** | **51 SSN**

**52 City** | **53 State** | **54 Zip Code** | **55 Date of Birth**

**56 Title** | **57 Phone Number** | **58 Interviewed**  a ☐ Yes  b ☐ No

| Part V | Preparer Information |

**59 Last Name** | **60 First Name** | **61 Middle Initial**

**62 Title** | **63 Phone Number** | **64 Date**  06/11/2002

| Part VI | Contact for Assistance (If different than Preparer Information in Part V) |

**65 Last Name**
BENSON

**66 First Name**
GREGORY

**67 Middle Initial**
D

**68 Title**
DIRECTOR, COMPLIANCE AND SECURITY

**69 Phone Number**
(703) 236-8021

**70 Agency (if applicable)**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Part 103. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose related to a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Secretary of the Treasury or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Such reports, or the fact they have been filed, may not be disclosed by a government employee to any person involved in the transaction, "other than as necessary to fulfill the official duties of such officer or employee." 31 U.S.C. 5318 (g)(2)(ii). Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

ÇTZADE 8

\*\*\* FACSIMILE \*\*\*                                  20021760026211

# Suspicious Activity Report

| | | |
|---|---|---|
| FRB: | FR 2230 | OMB No. 7100-0212 |
| FDIC: | 6710/06 | OMB No. 3064-0077 |
| OCC: | 8010-9,8010-1 | OMB No. 1557-0180 |
| OTS: | 1601 | OMB No. 1550-0003 |
| NCUA: | 2362 | OMB No. 3133-0094 |
| TREASURY: | TD F 90-22.47 | OMB No. 1506-0001 |

ALWAYS COMPLETE ENTIRE REPORT

Expires September 30, 1998

1   Check appropriate box:
a ☒ Initial Report       b ☐ Corrected Report       c ☐ Supplemental Report

## Part I   Reporting Financial Institution Information

2   Name of Financial Institution
E*TRADE BK

3   Primary Federal Regulator
a ☐ Federal Reserve   d ☐ OCC
b ☐ FDIC              e ☒ OTS
c ☐ NCUA

4   Address of Financial Institution
671 NORTH GLEBE ROAD

5   City
ARLINGTON

6   State
VA

7   Zip Code
22203

8   EIN or TIN
540301610

9   Address of Branch Office(s) where activity occurred
671 NORTH GLEBE ROAD

10   Asset size of financial institution
$ 0

11   City
ARLINGTON

12   State
VA

13   Zip Code
22203

14   If institution closed, date closed

15   Account number(s) affected, if any
a 2006452375
b

16   Have any of the institution's accounts related to this matter been closed?
a ☐ Yes   b ☐ No     If yes, identify   c
d

## Part II   Suspect Information

17   Last Name or Name of Entity
SIMBAQUEBA

18   First Name
MARIO

19   Middle Initial
A

20   Address
2053 NW 79 AVE SJO 9327

21   SSN, EIN or TIN (as applicable)
333882988

22   City
MIAMI

23   State
FL

24   Zip Code
33122

25   Country
US

26   Date of Birth
03/21/1967

27   Phone Number - Residence
(305) 716-9108

28   Phone Number - Work

29   Occupation

30   Forms of Identification for Suspect:
a ☒ Driver's License   b ☐ Passport   c ☐ Alien Registration   d ☐ Other
e   Number   S512540671010        f   Issuing Authority   FL

31   Relationship to Financial Institution:
a ☐ Accountant   d ☐ Attorney   g ☒ Customer   j ☐ Officer
b ☐ Agent        e ☐ Borrower    h ☐ Director   k ☐ Shareholder
c ☐ Appraiser    f ☐ Broker      i ☐ Employee   l ☐ Other

32   Is insider suspect still affiliated with the financial institution?
a ☐ Yes                    c ☐ Suspended   e ☐ Resigned
b ☒ No   If no, specify    d ☐ Terminated

33   Date of Suspension, Termination, Resignation

34   Admission/Confession
a ☐ Yes   b ☒ No

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Part 103. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose related to a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Secretary of the Treasury or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Such reports, or the fact they have been filed, may not be disclosed by a government employee to any person involved in the transaction, "other than as necessary to fulfill the official duties of such officer or employee." 31 U.S.C. 5318 (g)(2)(ii). Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.